People of the State of Illinois, ex rel. National Bank of Austin, Trustee Under Trust Number 3493, Dated December 8, 1960, E. L. Trendel, and E. L. Trendel and Associates, Inc., an Illinois Corporation, Plaintiffs-Appellees, v. County of Cook, a Body Politic, Daniel Ferrone, Zoning Administrator of Cook County, and Erwin Horwitz, Building Commissioner of Cook County, Defendants-Appellants, Lawrence Dilucchio, Stanley B. Adamson, W. E. Teske and Lake Briarwood Association, Inc., a Nonprofit Corporation, Intervenor-Defendants-Appellants.

Gen. No. 49,509.

First District, First Division.

March 1, 1965.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Edward J. Hladis, Chief of Civil Division and Joseph V. Roddy, Assistant State's Attorney, of counsel), for defendants-appellants. Ross, Hardies, O'Keefe, Babcock & McDugald, of Chicago (Richard F. Babcock and R. Marlin Smith, of counsel), for intervenor-defendants-appellants.

Herrick, Vette, McNeill & McElroy, of Chicago (William T. McNeill and Ray W. Fick, Jr., of counsel), for plaintiffs-appellees.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court.

The National Bank of Austin holds title, as trustee, to the property here involved. E. L. Trendel and Associates, Inc., a corporation engaged in real estate development is the owner of the beneficial interest in the land trust. E. L. Trendel is president of E. L. Trendel and Associates, Inc.

These plaintiffs filed a petition for a writ of mandamus to direct the County of Cook, Daniel Ferrone, Zoning Administrator of Cook County, and Erwin Horwitz, Building Commissioner of said County, to issue zoning certificates and building permits for the

construction of multiple-family dwellings on seven parcels of land in Lake Briarwood, a platted subdivision in an unincorporated area in Cook County, Illinois.

Lawrence DiLucchio, Stanley B. Adamson and Wilmer Teske are owners of property in said subdivision in close proximity to the subject property. Lake Briarwood Association, Inc., is a not-for-profit corporation composed of owners of property in the subdivision. These individual owners and the Association were granted leave of court to intervene.

The trial court heard the case and ordered the writ to issue. From this order defendants and intervenors appeal.

The essential facts are not in dispute. Lake Briarwood subdivision lies west of Des Plaines and south of Arlington Heights. The right of way of the Northwest Tollway adjoins the south boundary and the subject property abuts on the Tollway. A large lake is located in the center of the subdivision and subdivided lots are located around and abutting on the lake. The subject property is separated from the lake by a street and does not abut directly on this lake. Access to the subdivision is from Algonquin Road on the north.

The Trendel corporation purchased the land in 1958 when it was in a "F" Farming District under the Cook County Zoning Ordinance then in effect. In the spring of 1959 Trendel filed a petition to reclassify the entire area of the subdivision to R5 multiple-family District, and in August 1959 the request was granted. It was then the intent to develop the entire subdivision with multiple-family dwellings and it was so represented to the County Board of Zoning Appeals.

After the R5 zoning had been secured the Federal government increased interest rate requirements for lending institutions and Trendel found it impossible to obtain funds for the construction of multiple-family

dwellings. Because the Trendel corporation had loan commitments on the purchase of the land, it became necessary to start some type of construction and Trendel proceeded with the development of the subdivision with single-family homes. Trendel anticipated, however, that multiple-family dwellings would be constructed, and throughout the entire period of developing the subdivision with single-family homes Trendel "kept in mind the possibility that (he) might some day have to build multiple-family dwellings" in Lake Briarwood. He said he always told anyone who asked him that it would be possible to construct multiple-family dwellings in Lake Briarwood.

The Trendel corporation did execute two documents entitled "Declarations of Protective Covenants" which restricted the erection of multipe-family dwellings to lots in the subdivision away from the subdivided lots immediately abutting on the lake in the center of the subdivision. Both "Declarations" were recorded in the Office of the Recorder of Deeds of Cook County. The Trendel corporation also prepared and distributed an advertising brochure which contained pictures of single-family dwellings. The brochure contained the legend, "(O)nly 123 Estate sites will be offered in Lake Briarwood . . . . Each home, whatever its architecture, will harmonize subtly with every other home in a contemporary styling that is gratifying to the eye."

There are about 123 lots in Lake Briarwood. At the time of the trial, approximately 70 of these lots were occupied with single-family homes, some 50 of which had been built by Trendel. The Trendel corporation did sell some vacant lots on which single-family homes were built by the purchasers. There are no multiple-family dwellings built in the subdivision.

In the Fall of 1962, residents of the subdivision learned that Trendel was planning to construct multi-

439

ple-family dwellings. The Trendel corporation said it decided to go ahead with the construction on the subject property located at the southern end of the subdivision abutting on the northerly line of the Northwest Tollway right of way. The ensuing sequence of events followed:

1. Early February 1963: Allen Spiegler, a resident of the subdivision, learned from Mr. Trendel that he was planning to build apartments in Lake Briarwood. He told Trendel he was opposed to the construction of such apartments.

2. Late February 1963: Richard Buchman, a resident of the subdivision had a conversation with E. L. Trendel and in the course thereof was told by Trendel that he was going to build "some multiple units".

3. Late February or early March 1963: The proposed multiple-family development was brought to the attention of the Board of Directors of Lake Briarwood Association.

4. March 25, 1963: The Association, joined by 20 of the individual property owners sent a letter to the Cook County Zoning Board of Appeals requesting that the Board hold public hearings to determine whether Lake Briarwood should be reclassified from an R5 District to an R4 District. (R4 would not allow multiple-family dwellings.)

5. March 27, 1963: The Zoning Board sent a letter to E. L. Trendel advising him that it had received, and had under consideration, a written request for a public hearing to determine whether the public interest required a zoning amendment to reclassify the subdivision to the R4 zone.

6. March 28, 1963: Both E. L. Trendel and Daniel J. Ferrone, the Zoning Administrator, received

copies of the March 27 letter. Pursuant to a resolution of the Board of Commissioners, adopted on August 2, 1960,* Mr. Ferrone directed his chief deputy, Mr. Capparelli, to issue no zoning certificate for multiple-family construction in Lake Briarwood while hearings on the zoning reclassification were pending.

7. April 5, 1963: Capparelli received from Trendel, through the mails, applications, plans and documents requesting zoning certificates and building permits for seven multiple-family dwellings on the subject property.

8. April 26, 1963: Public hearings commenced before the Zoning Board and ended on May 10, 1963.

9. August 2, 1963: The instant cause was filed in the Superior Court of Cook County.

10. August 16, 1963: The Zoning Board recommended that the Board of Commissioners reclassify Lake Briarwood from the R5 multiple-family to R4 single-family District.

11. October 1, 1963: The Board of Commissioners amended the Zoning Ordinance so that all of the Lake Briarwood subdivision was placed in the R4 single-family District.

12. October 8, 1963: Trial of the instant case commenced.

---

* "Be it resolved by the Board of Commissioners of Cook County that the Zoning Administrator be and he is hereby instructed and directed not to issue any zoning certificate authorizing the use or construction of any structure on any real property, when such property, or any part thereof, is the subject matter of an application for an amendment to the Zoning Ordinance of Cook County, which application for an amendment has been filed with the Zoning Administrator prior to the request for a zoning certificate."

441

13. October 25, 1963: Finding and judgment in favor of the plaintiffs entered in the trial court.

■ Plaintiffs do concede that as a general rule a land owner has no vested right in the continuation of an existing zoning classification. But they contend that they had in good faith reliance on the existing R5 zoning classification of the subject property substantially changed their position or incurred expenditures on the probability that zoning certificates and building permits would be issued to them, thereby acquiring a "vested right" in the R5 classification irrespective of the subsequent change to R4 classification.

■ "The general rule in Illinois concerning the retroactive effect of zoning ordinances is stated in Deer Park Civic Ass'n. v. City of Chicago, 347 Ill App 346, 106 NE2d 823 (1952) (petition for leave to appeal denied 412 Ill 629), where the court held that any substantial change of position, expenditures or incurrence of obligations occurring under a building permit or in reliance upon the probability of its issuance is sufficient to create a right in the permittee and entitles him to complete the construction and use the premises for the purposes originally authorized irrespective of a subsequent zoning or change in zoning classification." Fifteen Fifty North State Street Bldg. Corp., v. Chicago, 15 Ill2d 408, 416, 155 NE2d 97 (1958). This principle of law is reiterated in People ex rel. Skokie Builders, Inc. v. Morton Grove, 16 Ill2d 183, 191, 157 NE2d 33 (1959) ; Nott v. Wolff, 18 Ill2d 362, 371, 163 NE2d 809 (1960) ; Illinois Mason Contractors, Inc. v. City of Wheaton, 19 Ill2d 462, 465, 167 NE2d 216 (1960) ; Cos Corp. v. City of Evanston, 27 Ill2d 570, 576, 577, 190 NE2d 364 (1963), and People ex

rel. Interchemical Corp. v. Chicago, 29 Ill2d 446, 194 NE2d 199 (1963).

The parties hereto have no quarrel with the principle of law as enunciated in the authorities cited and, in fact, they have relied upon them. The issue is whether the plaintiffs have proven that they have in good faith, made a substantial change in position, made expenditures, or incurred obligations in reliance upon the probability that the requisite zoning certificates and building permits would issue. Ronald Petrolito, testifying for plaintiffs, stated he was an architectural designer associated with the Trendel corporation and son-in-law of E. L. Trendel. Although a graduate of Illinois Institute of Technology he was not a licensed architectural engineer. His duties were to design and supervise the construction of buildings for Trendel. He was acquainted with Capparelli and, prior to the filing of the applications, had requested information from him on the placement of the buildings in the required setbacks and sidelines for the buildings in question. He first began to work on the project in October or November 1962. He said a lot of thought was given to the type of building that should be used in the location and the kind of building that "should go on" the several sites. He began to put his ideas on paper and a series of sketches were made. He talked to people "we worked with." He is a full-time employee of the Trendel corporation receiving a salary of $135 per week and estimated that he spent 50% of his time from November 1, 1962 to April 1, 1963, conceiving and working on the designs and drawings for the proposed construction.

In addition to Petrolito, the Trendel corporation contends it paid its full-time foreman whose salary was $170 per week for two or three weeks work on the proposed plans. Mr. Trendel's secretary spent one

week in the preparation of the plans and he was unable to estimate the days he personally spent in work on said plans. Plaintiffs say that "they gave no thought to the possibility that they would be called to account for the number of weeks and days they (individually) spent in furtherance of this organizational effort." They argue that if there was any thought of necessity of proof to show reliance on the existing zoning "it would have been easy to enter into a series of commitments with outside designers, planners and contractors. Instead, in entire good faith they worked on a collective effort within their organization without thought of any bookkeeping on their time."

We must, therefore, determine from the admitted facts and circumstances in the instant case whether plaintiffs acquired a vested right to use their property under the R5 classification irrespective of the change to R4 because they have in good faith suffered a substantial change in position, expenditures, or incurrence of obligations in reliance upon the probability that the zoning certificates and building permits would issue.

What is substantial? Although no Illinois case has defined "substantial" the term has been applied in many instances since the Deer Park case where the rule was adopted. The property owner in the Deer Park case paid $41,000 for his land and then entered into contracts for surveys, soil tests, the fabrication of structural steel, removal of topsoil, architectural services and general contracting. The property owner had actually paid $21,958.65 on the contracts and incurred liabilities on the contracts in the amount of $597,826.56. Before the effective date of the amendatory ordinance much of the construction and fabrication of the steel was accomplished. The Appellate Court found that this partial performance of contracts made in reliance on the probability that a permit

444

would issue and pursuant to substantial obligations relating directly to the purpose of the permit was sufficient to give rise to a vested right in the property owner.

In Fifteen Fifty North State St. Bldg. Corp. v. Chicago, 15 Ill2d 408, 155 NE2d 97, the property was purchased contingent upon there being a rezoning to Volume 4; payment of consideration therefor in the amount of $87,500 was held in abeyance until the amendatory ordinance became effective; a $105,000 architectural contract was executed preparatory to actual construction; sums in excess of $3,400 were spent for bonds, permits and soil tests; and the former residence on the tract was razed at a cost of $1,700. The court said (page 417): "Although some of these obligations were incurred prior to the date the building permit was issued, all were made subsequent to the June 6, 1956 amendatory ordinance and in reliance either upon a legal building permit or upon the probability of its issuance. The fact that the permit was later revoked is not material since no valid reason was assigned for this action. We therefore hold that by virtue of the change in defendant bank's (adjoining property owners sued to restrain the construction) position as above specified, the bank acquired a right under the 1956 ordinance and . . . the owner may proceed in reliance thereon unaffected by the ordinance adopted in 1957."

In Nott v. Wolff, 18 Ill2d 362, the court held that executing a 35-year lease for a total sum of $147,000 with an option to purchase, payment of $11,250 in architectural fees, and entering into a $90,000 construction contract created a substantial change in plaintiff's position and the incurrence of obligations all in reliance upon the existing ordinance, and the probable issuance of the permit established in plaintiff a vested right.

445

In Illinois Mason Contractors, Inc. v. City of Wheaton, 19 Ill2d 462, 167 NE2d 216, the property owner secured a loan commitment of $50,000 on which a 6½ percent commission was charged; entered into contracts for work to be done, totaling over $30,000, and had spent $5,600 for materials to be used in the proposed building. The court found that (page 465): "Acting in good faith, and relying upon the zoning ordinance which had been in effect since July 21, 1933, it had made substantial changes in its position and had incurred substantial obligations." Although in Cos Corp. v. City of Evanston, 27 Ill2d 570, 190 NE2d 364, the court found that the municipality led plaintiffs to believe a permit would issue and caused them to rely on the ordinance then in effect, the Supreme Court considered the expenditure of $47,000 for the purchase of the land and other property adjoining the site for $189,000; the obligation of $90,000 in architect's fees and expenditures; and $9,669.88 in legal or organizational fees to be substantial and that it would be a grave injustice to allow municipal officials to hold up action on issuance of a building permit until an amendatory ordinance could be passed so that a permit formerly lawful would now not issue.

The People ex rel. Interchemical Corp. v. Chicago, 29 Ill2d 446, 194 NE2d 199, case held that where land was purchased for $113,710, certain tenancies in the building were terminated; buildings on the property were razed; and a sale and leaseback arrangement was entered into all in reliance upon the board of zoning appeals' authorization and direction to issue a building permit was such change of position and expenditures to bring the case squarely within the ruling of the Fifteen Fifty North State Street Corp. case.

Plaintiffs, relying on People ex rel. Skokie Builders, Inc. v. Morton Grove, 16 Ill2d 183, 157 NE2d 33 urge that the Supreme Court affirmed the summary judg-

ment "in reliance on the expenditure of $1,830 and the fact that plans, specifications and plot plans had been procured although no expenditures for plans and specifications was before the court." In reading that authority we cannot accept such interpretation of the case. That case was tried upon the pleadings and stipulation of facts. The Supreme Court recited the expenditures alleged in the affidavit made by the property owner's secretary supporting its motion for summary judgment specifically mentioning the allegation therein that certain sums had been paid for "plans, plot plans and commitments for mortgage loan" together with $1,630 for permits and $200 deposit for sidewalks. The court also mentioned that the affidavit further alleged that an oral general construction contract had been entered into for $195,758.56. The court then found that it was stipulated by the parties that the petitioner caused to be prepared plans and specifications for the construction of four town houses of four units each and had caused the property to be surveyed; that it was further stipulated that "appellee" had purchased the land for $26,000. Then follows the quote plaintiffs rely on in their brief: "It will thus be noted that, while there is no admission of the exact amounts paid, it was stipulated that plans and specifications and plot plans had been procured. Furthermore, the expenditure of $1,830 was admitted and the record shows no repayment or tender. The conclusion that there were admitted substantial changes of position and expenditures within the meaning of the rule in Fifteen Fifty North State Building Corp. case is, in our opinion, justified." It is clear that the Supreme Court considered that the property owners did more than expend the sum of $1,830, the figure specifically mentioned.

█ As plaintiffs concede, the burden was upon them to prove a clear right that they had, while acting

447

in good faith, expended substantial sums and incurred substantial obligations. They claim to have spent money because of the salaries paid their employees who were thinking and conferring about multiple-family dwellings and drawing sketches. At most, plaintiffs paid approximately $1,600 to employees who would have been paid whether they put in time on this project or not. They proved no incurrence of obligations and the record does not indicate any change in their position.

In an action for mandamus the plaintiff must establish a clear, legal right to the writ. Hiawatha Community School Dist. v. Skinner, 32 Ill App2d 187, 191, 177 NE2d 15 (1961); Illinois Mason Contractors, Inc. v. City of Wheaton, 19 Ill2d 462, 167 NE2d 216.

From a consideration of the cases discussed it is our opinion that plaintiffs failed to establish a clear right to the relief requested by them. We are of the opinion that they have not, in good faith, suffered any substantial change of position in reliance upon the issuance of the permit or the previous existing zoning classification necessary to establish in them a vested right and as they have not challenged the validity of the amendatory zoning ordinance, it was error for the trial court to order the issuance of the writ of mandamus. The judgment of that court is hereby reversed.

Reversed.

BURMAN, P. J. and MURPHY, J., concur.