1350 LAKE SHORE ASSOCIATES, Plaintiff-Appellant, v. DENISE M. CASALINO, Commissioner, The Department of Planning and Development of the City of Chicago, *et al.*, Defendants-Appellees (Edward T. Joyce *et al.*, Intervenors-Appellees).

First District (3rd Division)    No. 1—04—3379

Opinion filed December 28, 2005.

DLA Piper Rudnick Gray Cary US LLP, of Chicago (Thomas F. Geselbracht and Kenneth L. Schmetterer, of counsel), for appellant.

Mara S. Georges, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon, and Kerrie Maloney Laytin, of counsel), for appellees Denise M. Casalino and City of Chicago.

Hedlund & Hanley, LLC, of Chicago (Reuben L. Hedlund, Jack Joseph, and Sarah J. Deneen, of counsel), for other appellees.

PRESIDING JUSTICE HOFFMAN delivered the opinion of the court:

The plaintiff, 1350 Lake Shore Associates (LSA), appeals from an order entered following our remand of this cause by which the circuit court: (1) refused to enjoin the City of Chicago and its agents from applying any provision of the Chicago Zoning Ordinance which would prevent LSA from constructing a high-rise building at 1320-30 Lake Shore Drive in accordance with the terms of a residential planned development ordinance which was passed in November 1978; and (2) entered a declaratory judgment that LSA was not entitled to a zoning certificate or building permit in connection with the plans it submitted to the Department of Planning and Development of the City of Chicago (Department of Planning) for the construction of the building. For the reasons that follow, we affirm.

This case is before us for the fourth time on appeal. As a result, we will recite only the procedural history and facts necessary to understand the issues presented in the instant appeal.

At all times relevant to this appeal, LSA owned the property located at 1320-30 Lake Shore Drive (hereinafter referred to as "the property"). On November 14, 1978, the Chicago city council approved LSA's application to change the property's zoning from an "R8 General Residence District" classification to "Residential Planned Development 196" (RPD 196), permitting the construction of a 40-story, 196-unit apartment building on the property. LSA, however, chose not to develop the property in accordance with RPD 196 at that time. On December 10, 1997, Charles Bernardini, then alderman of Chicago's 43rd Ward in which the property is located, introduced an ordinance (hereinafter referred to as the "down-zoning ordinance") proposing to change the property's zoning from RPD 196 to an "R6 General Residence District," under which LSA's proposed building was not a permitted use. The following day, LSA's project architect submitted plans for a high-rise building (Part II Submittal) to the Department of Planning, seeking the issuance of a Part II Approval letter. For property located in a planned development, a Part II Approval letter certifying that the architectural plans submitted comply with all the provisions of the applicable planned development ordinance is a prerequisite to the issuance of a zoning certificate which, in turn, is a prerequisite to the issuance of a building permit. See Chicago Zoning Ordinance § 11.5 (amended July 21, 1999), § 11.11—3(b) (amended December 11, 1991). Although the plans submitted by LSA fully complied with the requirements of RPD 196, the Department of Planning took no action on LSA's Part II Submittal. On April 29, 1998, the Chicago city council approved the down-zoning ordinance, which became effective on May 20, 1998.

LSA filed its initial complaint in this action naming as defendants the commissioner of the Department of Planning (Commissioner) and the City of Chicago (City) (hereinafter referred to collectively as the "City defendants"). Thereafter, Edward T. Joyce, Carl Hunter, John Stassen, John C. Mullen, Clark W. Fetridge, Respicio F. Vasquez, and Bernard J. Miller (hereinafter referred to collectively as the "intervenors"), all of whom own property located within 250 feet of the subject property, were granted leave to intervene. LSA's original three-count complaint was amended a number of times during the proceedings. In count I of its first-amended complaint, LSA sought a writ of *mandamus* directing the Commissioner to issue a Part II Approval letter. Count II sought a declaration that the down-zoning ordinance did not affect LSA's right to develop the property in conformity with RPD 196 and an injunction barring the City from enforcing the down-zoning ordinance against it. Count III sought a declaration that the down-zoning ordinance, along with a subsequently enacted ordinance imposing a 125-foot height limitation on any new construction, were both void. The circuit court later granted LSA's motion to voluntarily dismiss count II.

Separate bench trials were conducted on counts I and III of LSA's amended complaint.[1] The evidence introduced at the trial on count I established the following relevant facts.

After having secured the passage of RPD 196 in 1978, it was not until sometime in 1996 that LSA, through its agent, Draper and Kramer, Inc. (Draper), began investigating the possibility of developing the property in conformity with RPD 196. LSA eventually authorized Draper to proceed with the project on its behalf. To this end, in early 1997, Draper, acting on behalf of LSA, hired Jack Guthman, an attorney specializing in zoning law, to represent it in connection with the project, and also hired Solomon Cordwell Buenz & Associates, Inc. (SCB), to render architectural services for the proposed development. Draper subsequently hired a surveyor, an urban planner, an elevator consultant, and an artist to create a rendering from the architect's conceptual drawings.

Upon being hired, Guthman suggested that, as a measure of "good

---

[1]Count III was later amended in LSA's fourth-amended complaint to seek a declaration that a later-enacted 90-foot height limitation ordinance was also void. Following the trial, the circuit court entered judgment in favor of the City defendants and the intervenors on count III, finding that the challenged ordinances are constitutionally valid as applied to the property. We affirmed the circuit court's judgment in *1350 Lake Shore Associates v. Casalino*, 352 Ill. App. 3d 1027, 816 N.E.2d 675 (2004).

zoning practice," representatives of Draper should meet with Bernardini and members of the surrounding community regarding the proposed project. In the spring of 1997, a meeting took place at Draper's office between Guthman; William Bennett, president and chief executive officer of Draper; William VanSenus, an employee of Draper; and Bernardini. Guthman estimated that the meeting took place in April or May 1997. At the meeting, Bernardini was informed of the property's existing zoning and shown preliminary building designs. Guthman and the Draper representatives testified that Bernardini requested that additional parking spaces be provided in the building. VanSenus added that the alderman asked if the facade of the building could be improved. Aside from these requests, the three men testified that Bernardini made no mention of opposition from community members or that he was considering down-zoning the property. For his part, Bernardini acknowledged that he did not mention down-zoning at the meeting. However, he stated that he informed Guthman and the Draper representatives that the proposed development would be controversial due to its size and density and that, if they wanted his support, they should meet with neighborhood organizations and reach some kind of an agreement. In an effort to accommodate Bernardini's requests, Draper subsequently instructed SCB to modify the building plans by adding more parking spaces and changing the design of the building's facade.

Guthman testified that, after the initial meeting with Bernardini, the two met for lunch on August 1, 1997. Guthman stated that he was certain of this date because it was noted in his diary. On cross-examination, Guthman was asked about an affidavit filed prior to trial in which he averred that this meeting took place "[s]hortly after" the initial meeting. When questioned about the discrepancy, Guthman stated that he was sure that the second meeting did not take place prior to August 1, 1997. According to Guthman, Bernardini mentioned at the meeting that some residents wanted the property down-zoned. Guthman testified, however, that Bernardini did not express an intention to introduce a down-zoning ordinance; rather, the alderman merely asked whether the density of the building could be reduced. Bernardini, on the other hand, testified that, following the initial meeting, he had "regular periodic discussions" with Guthman when the two of them would see each other at zoning committee meetings or social affairs. When asked when he first mentioned to any Draper representative that he was considering the possibility of down-zoning the property, Bernardini stated that it was "shortly after" his first meeting with them. Bernardini testified that he told Guthman that he was getting an increasing number of neighborhood complaints about

the project, that he had been asked to down-zone the property, that down-zoning was "certainly a consideration if they weren't able to reach a compromise," but that he was hopeful that a compromise could be reached. Bernardini did not think that this conversation with Guthman took place as late as August 1, 1997, and reiterated that it was shortly after the initial meeting. He further testified that he made it clear to Guthman from very "early on" that, if no compromise was reached, the property would be down-zoned. Guthman testified that, following the second meeting with Bernardini, he reported to Draper that the alderman had been asked to down-zone the property and that it was important to find a way to resolve the matter.

In October 1997, Draper representatives met with Bernardini and showed him the revised plans for the project. Bernardini told them to show the plans to the community representatives. VanSenus testified that the alderman did not mention at the meeting that he was going to down-zone the property. According to Guthman, he again spoke to Bernardini sometime after October 22, 1997. Guthman stated that it was at this chance meeting that Bernardini expressed an increased sense of urgency regarding the need for Draper to reach a compromise with the community representatives. It was Guthman's understanding that Bernardini was holding out the introduction of a down-zoning ordinance as a threat to cause Draper to negotiate with the community organizations.

In early November of 1997, Bennett met with members of the Near North Preservation Coalition (NNPC), a neighborhood group which opposed the high-rise building. Among the NNPC members present at the meeting was Jim Gidwitz, who could not recall the exact date of the meeting, but acknowledged that it took place "by November 14." Gidwitz told Bennett that the NNPC was generally opposed to the construction of new high-rises in the area and that the density of the proposed building was the major concern. Bennett stated that he told the NNPC members that Draper "would do anything to cooperate with the neighborhood," so long as the "economics of the property" would not be jeopardized. Gidwitz, however, stated that, given the parties' divergent positions on the matter, namely, NNPC's opposition to the construction of high-rises in the area and Draper's proposal to build a high-rise, "there didn't seem to be any common ground or ability to create any common ground" between their two positions.

On November 17, 1997, members of the NNPC met with Bernardini and requested that he introduce a down-zoning ordinance. Bernardini stated that he was never uncertain about supporting such an ordinance. According to the alderman, he was trying to give the par-

ties as much time as possible to reach a compromise, but that it was his intention from very early on "that[,] if a compromise was not reached that was satisfactory to the community, that [he] would introduce and support a down-zoning ordinance." To this end, the alderman agreed to introduce the ordinance at the next city council meeting. Upon learning of Bernadini's plan, Guthman went to see him on November 19, 1997, and asked that he not submit the ordinance. Guthman told the alderman that it was his understanding that real progress was being made between Draper and members of the community toward a compromise and that the introduction of such an ordinance would be detrimental to the negotiations. According to Guthman, Bernardini agreed to wait until the next council meeting to submit the ordinance but, in return, asked that Draper not file its Part II Submittal before then. Guthman agreed and stated that he believed negotiations with the community members would continue in the following weeks. Bernardini, however, denied having asked Draper to delay filing its Part II Submittal.

By December 10, 1997, the date of the next Chicago city council meeting, no compromise had been reached and Bernardini introduced the down-zoning ordinance on that date. Bernadini stated that, while the down-zoning process was taking place, he had still hoped that the parties would reach a compromise. The following day, SCB submitted a Part II Submittal for the project to the Department of Planning. Draper representatives met with members of the NNPC on several more occasions, but the parties were unable to reach an agreement. On April 29, 1998, the Chicago city council approved the down-zoning ordinance, which became effective on May 20, 1998. LSA never received a response from the Department of Planning concerning its Part II Submittal.

Following the trial on count I, the circuit court entered judgment in favor of the City defendants and the intervenors. Finding that the circuit court erred in applying the "pending ordinance" doctrine, we reversed the judgment on appeal and remanded the case to the court with directions that it issue a writ of *mandamus* requiring the Commissioner to issue the Part II Approval letter requested by LSA. *1350 Lake Shore Associates v. Hill*, 326 Ill. App. 3d 788, 761 N.E.2d 760 (2001) (hereinafter referred to as *Lake Shore I*).

On remand, the intervenors filed a motion for declaratory judgment, seeking a declaration that LSA is not entitled to a zoning certificate or a building permit in connection with the plans for which this court ordered that a Part II Approval letter be issued. Thereafter, LSA filed a second-amended complaint. In count I of that complaint, LSA sought similar relief as it originally requested in count II of its

first amended complaint, which it voluntarily dismissed; namely, orders requiring the zoning administrator to issue it a zoning certificate and enjoining the City and its agents from applying any provision of the Chicago zoning ordinance which would prevent it from exercising its rights pursuant to RPD 196. In its third-amended complaint, LSA substituted Alicia Mazur-Berg, the current Commissioner at the time, for Christopher Hill, her predecessor. The parties consented to having the circuit court decide the issue of LSA's entitlement to the relief at issue based upon the evidence introduced at the trial on count I of LSA's first amended complaint.

On May 31, 2002, the circuit court entered judgment in part in favor of LSA on count I of its third-amended complaint, directing the Commissioner to issue LSA a Part II Approval letter. However, the court also held that LSA did not have a vested right to the issuance of a zoning certificate or building permit for the development of its proposed high-rise building and: (1) entered judgment in part in favor of the City defendants and the intervenors on count I of the complaint, thereby denying LSA's request for orders requiring the zoning administrator to issue it a zoning certificate and enjoining the City and its agents from applying any provision of the Chicago Zoning Ordinance which would prevent it from exercising its rights pursuant to RPD 196; and (2) granted the intervenors' motion for a declaratory judgment. In its order, the court specifically found that the expenses associated with the project were not incurred "in good faith reliance on the continued zoning classification, but rather were incurred in the hope of reaching a compromise."

On appeal, we found that LSA's vested rights claim required additional findings of fact to be made by the circuit court. Accordingly, we reversed those portions of the circuit court's order denying LSA's request for an order enjoining the City and its agents from applying any provision of the Chicago Zoning Ordinance which would prevent it from developing the property in accordance with the terms of RPD 196; and granting the intervenors' motion for a declaratory judgment that LSA is not entitled to a zoning certificate or a building permit pursuant to RPD 196. *1350 Lake Shore Associates v. Mazur-Berg*, 339 Ill. App. 3d 618, 641, 791 N.E.2d 60 (2003) (hereinafter referred to as *Lake Shore II*). We remanded the matter to the circuit court with directions that it make specific findings as to: (1) the date on which LSA knew or should have known that it was probable that Bernardini would introduce a down-zoning ordinance; (2) the total amount of the expenses which LSA had incurred in connection with the project as of that date; and (3) whether those expenses were substantial enough to give rise to a vested right to the issuance of a zoning certificate and

building permit pursuant to RPD 196. *Lake Shore II*, 339 Ill. App. 3d at 641.

On October 15, 2004, the circuit court issued a written memorandum order in which it determined that: (1) LSA knew it was probable that Bernardini would introduce a down-zoning ordinance "on any date after the April-May 1997" meeting between the alderman, Guthman, and the Draper representatives; (2) as of that date, LSA incurred expenditures in the amount of $18,900.16 in connection with the project; and (3) the expenses were not substantial enough to give LSA a vested right to the issuance of a zoning certificate and building permit pursuant to RPD 196. The court again entered judgment in favor of the City defendants and the intervenors on count I of LSA's third amended complaint. LSA now appeals.

LSA contends, as it did before our remand of this cause, that the circuit court erred in entering judgment in favor of the City defendants and the intervenors on count I of its third-amended complaint. It argues that all three of the circuit court's findings are against the manifest weight of the evidence or contrary to law. Before examining the court's specific findings in this regard, we first set forth certain well-settled principles necessary for our resolution of the issues before us.

■ In *Lake Shore II,* we noted that there is generally no vested right to the continuation of a zoning ordinance. *Pioneer Trust & Savings Bank v. County of Cook*, 71 Ill. 2d 510, 517, 377 N.E.2d 21 (1978). However, Illinois courts have recognized an exception to this rule. As our supreme court stated in *People ex rel. Skokie Town House Builders, Inc. v. Village of Morton Grove*, 16 Ill. 2d 183, 191, 157 N.E.2d 33 (1959):

> "[W]here there has been a substantial change of position, expenditures or incurrence of obligations made in good faith by an innocent party under a building permit or in reliance upon the probability of its issuance, such party has a vested property right and he may complete the construction and use the premises for the purposes originally authorized, irrespective of subsequent zoning or a change in zoning classification."

The determination of whether a property owner has obtained a vested right to the issuance of a zoning certificate and building permit pursuant to a particular zoning ordinance rests on the resolution of two questions. First, it must be determined which of the expenses the property owner made or obligations it incurred were done in good-faith reliance on the probability that it would obtain a zoning certificate and building permit pursuant to the current zoning ordinance. *American National Bank & Trust Co. of Chicago v. City of*

*Chicago*, 19 Ill. App. 3d 30, 34, 311 N.E.2d 325 (1974). Second, it must be determined whether those expenditures or obligations were substantial. *American National Bank & Trust Co.*, 19 Ill. App. 3d at 34; *People ex rel. Shell Oil Co. v. Town of Cicero*, 11 Ill. App. 3d 900, 904, 298 N.E.2d 9 (1973). Central to the first inquiry is the proposition that, once a property owner becomes aware that it is probable that an amendatory zoning ordinance will be introduced, it can no longer be said to be able to rely in good faith on the probability that a zoning certificate or a building permit will issue pursuant to the property's current zoning. *Lake Shore II*, 339 Ill. App. 3d at 634.

The circuit court's finding on the issue of whether a property owner has a vested right to the issuance of a zoning certificate and building permit will not be set aside on review unless it is against the manifest weight of the evidence. *Pioneer Trust & Savings Bank*, 71 Ill. 2d at 516-17; *Industrial National Mortgage Co. v. City of Chicago*, 95 Ill. App. 3d 666, 671, 420 N.E.2d 581 (1981). That is to say, only when an opposite conclusion is clearly evident or the factual findings on which it is based are unreasonable, arbitrary, or not based on the evidence will we find a judgment to be against the manifest weight of the evidence. See *Brody v. Finch University of Health Sciences/The Chicago Medical School*, 298 Ill. App. 3d 146, 153, 698 N.E.2d 257 (1998). Matters relating to the credibility of witnesses or the weight to be accorded the evidence are within the province of the circuit court to decide. *Kleidon v. City of Hickory Hills*, 120 Ill. App. 3d 1043, 1053, 458 N.E.2d 931 (1983).

We first turn the to the circuit court's finding as to the date on which LSA knew or should have known that it was probable that Bernardini would introduce a down-zoning ordinance. The court found that LSA had the requisite knowledge at the time Bernardini first informed Draper's representatives that, if no compromise was reached with the community representatives, a down-zoning ordinance would be introduced. In determining this date, the court focused on the conflicting testimony between Bernardini and Guthman with respect to their communications following their initial meeting in April or May 1997. Finding that Bernardini's testimony that the meeting took place "shortly after" the initial meeting between the parties to be more credible than that of Guthman on this point, the court held that, on "any date after the April-May 1997 meeting," LSA knew or should have known that Bernardini was going to introduce a down-zoning ordinance.

■ As a preliminary matter, LSA first contends that the judgment should be reversed on the sole basis that the circuit court failed to follow our mandate instructing it to make a finding as to the specific

date on which LSA knew or should have known it was probable that a down-zoning ordinance would be introduced. However, as will be discussed in further detail later in this opinion, the selection of a specific date was not possible based on the evidence presented at trial and we, therefore, reject LSA's first assignment of error.

LSA next takes issue with the method the circuit court used to determine the date on which it knew or should have known that it was probable that Bernardini would introduce a down-zoning ordinance. It asserts that at no time did Bernardini threaten to down-zone the property; rather, he merely stated to Guthman and the Draper representatives that he would introduce a down-zoning ordinance if LSA could not reach a compromise with the community representatives. According to LSA, the relevant question is not, as the circuit court concluded, the date on which Bernardini relayed this information to Guthman. It argues that the relevant question turns on a determination of when "it bec[a]me 'probable' that a compromise could not be reached with 'the neighbors,' and thus probable that the alderman would go ahead and introduce a down-zoning ordinance." LSA's argument is based on the premise that the alderman's statement to Guthman was conditional, and, until the condition was satisfied, there could be no probability of down-zoning. In other words, LSA argues that there could be no probability of down-zoning until there was a resolution of the question of whether the parties would reach a compromise or come to an impasse on the issue. To this end, LSA asserts that Draper, on its behalf, made considerable efforts to address neighborhood concerns by making modifications to the proposed building, as per the alderman's requests. It also contends that the only neighborhood organization given authority over this issue was the NNPC, which did not even come into formation until later in 1997, and, further, that it was not until November 1997 when members of the NNPC met with Draper representatives and concluded that a compromise would not be reached.

■ The record shows that, following the initial meeting between Bernardini, Guthman, and the Draper representatives in April or May 1997, Bernardini again met with Guthman. Bernardini testified that he told Guthman at this subsequent meeting that he was getting an increasing number of neighborhood complaints about the project, that he had been asked to down-zone the property, that down-zoning was "certainly a consideration if they weren't able to reach a compromise," but that he was hopeful that a compromise could be reached so that he would not have to down-zone the property. Bernardini testified that he made it clear to Guthman from very "early on" that if no compromise was reached, the property would be down-zoned. Although

Bernardini's statements may very well be characterized as conditional, namely, that he would down-zone the property if Draper did not reach a compromise with the neighbors in the area, we agree with the circuit court's finding that, when Bernardini relayed these statements to Guthman, Draper, acting on behalf of LSA, could "no longer rely in good faith on the probability that a zoning certificate and a building permit would issue pursuant to RPD 196." *Lake Shore II*, 339 Ill. App. 3d at 640. There is no question that Bernardini wanted the parties to reach an agreement and hoped that they would be able to do so even after the down-zoning ordinance was introduced. However, Bernardini's statements to Guthman regarding his position were unequivocal. He told Guthman that he was asked to down-zone the property and that this was certainly a consideration if the parties could not reach a compromise. We believe a reasonable inference can be made that, when Bernardini relayed these statements to Guthman, it was at that point that Draper, acting on behalf of LSA, knew or should have known that, regardless of the success of any attempts at reaching a compromise with community members, it could no longer rely in good faith on the probability that it would be issued a zoning certificate and building permit in accordance with RPD 196.

We next turn to the question of when Bernardini relayed the above-referenced statements to Guthman. At trial, Guthman testified that he met Bernardini for lunch on August 1, 1997, at which time the alderman mentioned that some of the neighborhood residents wanted the property down-zoned. Guthman stated that he was certain of this date because he made note of the lunch in his diary. The court, however, found that Guthman's testimony was significantly impeached on this point based on his pretrial affidavit in which he placed the date of the meeting in question to be "shortly after" the April or May 1997 meeting. With respect to the discussion at issue, Bernardini stated that it occurred "shortly after" the spring 1997 meeting with Guthman, and that it definitely did not take place as late as August 1, 1997. The circuit court found Bernardini's testimony to be more credible on this point and found that the discussion described by both men actually occurred "shortly after" their initial meeting in April or May 1997. The court expressly acknowledged that its finding in this regard "does not result in a firm, exact date." It refused, however, to speculate as to the exact date, stating that it was LSA's burden to establish the exact date on which it knew or should have known that down-zoning was probable. Accordingly, the court concluded that "the date that [LSA] was on notice that the introduction of the down-zoning ordinance was reasonably likely was on any date after the April-May 1997 meeting."

Given that it is the circuit court's function to assess the credibility of witnesses and the weight to be accorded the evidence, LSA does not challenge the court's credibility findings in any meaningful way. Instead, LSA contends that the circuit court erred in imposing upon it the burden to establish the exact date on which it knew or should have known that it was probable that a down-zoning ordinance would be introduced. Relying on *American National Bank & Trust Co. v. City of Chicago*, 19 Ill. App. 3d 30, 311 N.E.2d 325 (1974), LSA argues that "[w]hatever burden [it] may have to demonstrate its right to the issuance of development permits, [it] surely is not required to prove an ongoing, continual right to rely on the law of the land."

In *American National Bank & Trust Co.*, the petitioners sought a writ of *mandamus* directing the building commissioner of the City of Chicago to issue it a permit for the construction of a high-rise building. The circuit court ordered a peremptory writ of *mandamus*, requiring the respondents to issue the requested permit. On appeal, this court held that "[i]t was for the respondents to show that the plan which would change the zoning of the petitioners' land was known to the petitioners prior to the time that substantial expenditures were made." *American National Bank & Trust Co.*, 19 Ill. App. 3d at 35. To the extent that *American National Bank & Trust* could be read as placing the burden of proof on the defendants rather than the plaintiff, we decline to follow it in light of the weight of authority placing the burden of proof on the party claiming an entitlement to a vested right. See *People ex rel. National Bank of Austin v. County of Cook*, 56 Ill. App. 2d 436, 447-48, 206 N.E.2d 441 (1965) (the burden is on the plaintiff "to prove a clear right that they had, while acting in good faith, expended substantial sums and incurred substantial obligations"); *Zeitz v. Village of Glenview*, 304 Ill. App. 3d 586, 594, 710 N.E.2d 849 (1999).

■ We conclude that the circuit court properly found that, as the party charged with proving its entitlement to a vested right, LSA had the burden to demonstrate the exact date on which it knew or should have known it was probable that Bernardini would introduce a down-zoning ordinance. LSA failed to satisfy its burden on this point. After making its credibility findings and determining the weight to be accorded the conflicting testimony, the circuit court could only conclude that "shortly after" the initial spring 1997 meeting or, in other words, on "any date after the April-May 1997 meeting," LSA knew or should have known that it was probable that Bernardini would introduce a down-zoning ordinance. We cannot say, based on our review of Bernardini's testimony, that the circuit court's finding in this regard is against the manifest weight of the evidence.

We next turn to the circuit court's finding as to the total amount of expenses which LSA had incurred in connection with the project prior to the date when it knew or should have known that it could no longer rely in good faith upon the issuance of a permit pursuant to RPD 196.

During trial, LSA introduced into evidence an exhibit entitled "Development Expenditure Summary" and numerous invoices detailing the expenses Draper incurred on LSA's behalf in connection with the project. The invoices were from the following entities: Guthman's law firm, Shefsky and Froelich, Ltd.; SCB, the architect; Chicago Guarantee Survey Company (Chicago Guarantee), a land surveying company; John J. Urbikas & Associates, an elevator consultant; the studio of James C. Smith, an architectural illustration company; and Okrent Associates, a company which does three dimensional computer modeling and simulation. The circuit court carefully itemized the expenses which LSA incurred at various time periods and concluded that, as of May 21, 1997, LSA incurred $18,900.16 in expenses; as of August 1, 1997, $133,348.81 in expenses had been incurred; and by October 22, 1997, LSA incurred $181,778.06 in expenses. Because the circuit court was unable to make a finding as to the exact date upon which LSA knew or should have known that it was probable that Bernardini would introduce a down-zoning ordinance, it concluded that expenses incurred after May 21, 1995, were not incurred in good-faith reliance upon the issuance of a permit in accordance with RPD 196. Accordingly, the court found that "shortly after" the initial meeting in April or May 1997, Draper incurred expenses on behalf of LSA in the amount of $18,900.16.

LSA first takes issue with the circuit court's decision not to credit LSA for architectural expenses incurred in the amount of $94,000, until August 1, 1997. Resolution of this issue turns on a determination of when Draper, on behalf of LSA, assumed the financial risk for the preparation of architectural drawings for the project.

The evidence at trial shows that, in February 1997, Draper hired SCB to render architectural services, and the services were to be completed during different phases of the project, the first of which was defined as the "conceptual" phase. In a letter dated February 4, 1997, Draper confirmed that SCB would be performing conceptual architectural work at its own risk and that, in the event that Draper had to terminate the project for any reason, SCB would not be paid for those services. The letter further provides that SCB was not authorized to "go beyond the 'conceptual' phase" of the project and that such authorization would be contained in formal contracts to be executed by the parties. In a subsequent June 25, 1997, letter from

SCB to Draper, there is no discussion concerning which party bore the financial risk of the project as of that date, but a proposed fee of $94,000 for SCB's conceptual services was given. A July 11, 1997, internal memorandum between Draper employees indicates that it still did not intend to assume the financial risk for conceptual architectural services. In summarizing the costs and timing of the project, the memorandum states that the "[t]otals assume that SCB will not be paid for conceptual drawings (proposed fee of $94,000) until it is determined that [the] project will go forward." On July 28, 1997, however, Draper sent SCB a memorandum authorizing it to move beyond the conceptual phase. It specifically states that Draper "[has] authorized SCB to take the lead in contracting, scheduling and coordinating the various design and testing activity required for this project to advance to the Part II zoning review, and if all goes well to that point, on to the securing of a foundation permit." On August 1, 1997, SCB sent Draper a bill in the amount of $94,000 for its conceptual services rendered. Based on the forgoing evidence, the circuit court concluded that Draper, acting on behalf of LSA, had incurred the expense for the preparation of conceptual architectural drawings as of July 28, 1997, but not before that date. Although LSA maintains that the $94,000 should have been counted with the expenses incurred as of May 1997, we find that the evidence supports the circuit court's decision not to include the amount until Draper finally assumed financial responsibility for SCB's services.

As its next assignment of error, LSA contends that the circuit court "refused to credit [LSA] for the extensive time and effort incurred on its behalf by Draper['s] *** employees." LSA argued in the circuit court that, by June 30, 1997, Draper's employees performed 738 hours of work on the project amounting to a total expenditure of $100,287.50. The circuit court, however, held that internal employee expenses are to be excluded from the calculation of the total amount of expenses in a vested rights case, finding that this court's decision in *People ex rel. National Bank of Austin v. County of Cook*, 56 Ill. App. 2d 436, 206 N.E.2d 441 (1965), was dispositive of this issue.

In *National Bank of Austin*, the plaintiffs sought a writ of *mandamus* directing the county to issue a zoning certificate and building permit for the construction of multiple-family dwellings on seven parcels of land. On appeal, the plaintiffs argued that they incurred expenses in the amount of $1,600, which represented the salaries paid to the employees who had worked on the proposed project. We rejected the plaintiffs' argument, noting that "[a]t most, plaintiffs paid approximately $1,600 to employees who would have been paid whether they put in time on this project or not." *National Bank of Austin*, 56

Ill. App. 2d at 448. Because the employees would have been paid regardless of their time spent working on the construction project, we concluded that they failed to establish a substantial change of position in reliance upon the issuance of a building permit. *National Bank of Austin*, 56 Ill. App. 2d at 448.

LSA attempts to distinguish the holding in *National Bank of Austin* by surmising that perhaps the Draper employees "may not have been kept on the payroll had 1350 [LSA] not sought to develop the Site." To the extent that LSA asks us to speculate on this point, we decline to do so. Moreover, as the circuit court noted, VanSenus was the only witness to testify as to the necessity of the work performed by the Draper employees. He stated that, in the event that LSA's proposed project had not existed, the Draper employees would either have worked on other projects or Draper "would have decreased the number of people, one of the two." We find this evidence inconclusive to establish that the Draper employees would not have been retained absent LSA's project. Because LSA has failed to establish that payments to Draper's employees constituted a "substantial change of position, expenditures or incurrence of obligations", we conclude that the circuit court properly excluded from its computation of expenses any costs associated with the salaries paid to the Draper employees.

Having rejected LSA's arguments with respect to the circuit court's computation of expenses, we conclude that the court's finding that LSA incurred expenses in the amount of $18,900.16 prior to the time that it knew or should have known that it could no longer, in good faith, rely upon the issuance of a building permit pursuant to RPD 196 is not against the manifest weight of the evidence.

We now turn to the question of whether the $18,900.16 incurred by LSA is "substantial" enough to give rise to a vested right to the issuance of a zoning certificate and a building permit pursuant to RPD 196.

No Illinois case has provided any clear guidelines as to how to measure substantiality in a vested rights case. See *National Bank of Austin*, 56 Ill. App. 2d at 444 ("no Illinois case has defined 'substantial' "). Our research has revealed countless decisions addressing whether the expenses incurred in those particular cases were substantial enough to give rise to a vested right. However, the majority of these cases list the expenditures and obligations incurred by the landowner and then reach a conclusion as to whether the amounts were substantial enough, without further analysis. See, *e.g.*, *Deer Park Civic Ass'n v. City of Chicago*, 347 Ill. App. 346, 106 N.E.2d 823 (1952); *People ex rel. Skokie Town House Builders, Inc. v. Village of Morton Grove*, 16 Ill. 2d 183, 157 N.E.2d 33 (1959); *Illinois Mason Contrac-*

*tors, Inc. v. City of Wheaton*, 19 Ill. 2d 462, 167 N.E.2d 216 (1960); *Mattson v. City of Chicago*, 89 Ill. App. 3d 378, 411 N.E.2d 1002 (1980). What is clear from our review of these cases is that there is no bright-line rule for determining the substantiality of expenses incurred by a landowner in good faith reliance upon the issuance of a building permit.

The parties first disagree as to whether we should employ a "proportionality test" in determining whether a substantial sum was expended. This test compares the amount of expenses incurred to the projected costs of the development. LSA argues that we should not use such a test because the court in *American National Bank & Trust* clearly stated that "substantiality is determined without regard to any proportional test." *American National Bank & Trust*, 19 Ill. App. 3d at 34. The City, on the other hand, argues that proportionality is indeed a relevant factor which we should consider in our analysis. In support of its argument in this regard, the City relies on the more recent decision in *Zeitz v. Village of Glenview*, 304 Ill. App. 3d 586, 710 N.E.2d 849 (1999), wherein the court implicitly considered proportionality by comparing the landowner's expenditures of $38,000 "in relation to the property's value of more than $1 million." We agree with the City's position on this point.

Although the court in *American National Bank & Trust* rejected the use of a proportionality test, it did so without any explanation. The court cited to the decision in *National Bank of Austin*; however, nowhere in that case does the court even mention the concept of proportionality. We find no reason why proportionality should not be considered in determining whether substantial expenditures have been made by a landowner. We believe that the amount spent on a proposed development when viewed in relation to the total costs of the project is very relevant to this question. A developer who spends $20,000 on a project estimated to cost $40,000 is in a quite different position than a developer who spends $20,000 on a project estimated to cost $1 million. Arguably, the former developer could be said to have incurred substantial expenditures, while the same cannot be said in the latter situation. Accordingly, we conclude that proportionality is a factor to be considered in a vested rights analysis.

Aside from proportionality, we believe that a court should take into consideration additional factors such as the purchase price of the land (see *American National Bank*, 19 Ill. App. 3d at 34-35), the amount of expenses incurred, and the character of the entity incurring the costs, for what might be considered a large investment for an individual homeowner could be considered minimal for a large land developer. These examples are by no means intended to be an exhaus-

tive list of factors. Rather, we have cited these examples merely to illustrate that any factor which is relevant to the question of substantiality should be considered. We believe that, in determining substantiality, a court should employ a totality-of-circumstances approach, rather than measure substantiality in terms of absolute dollars only.

■ Turning to the instant case, the trial court concluded that, in the relevant time period defined as "shortly after" the initial meeting between the parties in spring 1997, Draper incurred expenses in the amount of $18,900.16 by retaining the services of various architects, surveyors, attorneys, consultants, and graphic designers to work on the project. LSA contends that, in making these calculations, the circuit court ignored invoices from Chicago Guarantee and SCB in the amounts of $9,905 and $7,500, respectively. However, even taking these figures into account, LSA would have spent approximately $36,300 before it knew or should have known that it could no longer rely upon the issuance of a building permit pursuant to RPD 196. LSA's witnesses at trial estimated the value of the land to be $6 million and the cost of the project to be $70 million. We believe that, looking at the totality of the circumstances, expenses incurred in the amount of $36,300 are wholly insubstantial when viewed in relation to the $6 million value of the land and the $70 million cost of the project. Further, Draper, acting on behalf of LSA, is certainly not an entity for which $36,300 could arguably be considered a substantial expenditure. Based on the evidence presented, we cannot say that the circuit court's finding that LSA failed to establish that it incurred obligations or expenses substantial enough to give rise to a vested right to the issuance of a zoning certificate and building permit pursuant to RPD 196 is against the manifest weight of the evidence.

For the forgoing reasons, we affirm the circuit court's judgment: (1) denying LSA's request for an order enjoining the City and its agents from applying any provision of the Chicago Zoning Ordinance which would prevent it from developing the property in accordance with the terms of RPD 196; and (2) granting the intervenors' motion for a declaratory judgment that LSA is not entitled to a zoning certificate or a building permit pursuant to RPD 196.

Affirmed.

THEIS and ERICKSON, JJ., concur.