Docket No. 102093.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

---

1350 LAKE SHORE ASSOCIATES, an Illinois Limited Partnership, Appellant, v. LORI T. HEALEY, Commissioner, Department of Planning and Development of the City of Chicago, *et al*., Appellees (Edward T. Joyce *et al*., Intervenors-Appellees).

*Opinion filed December 21, 2006.*

JUSTICE GARMAN delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Freeman, Fitzgerald, Kilbride, and Karmeier concurred in the judgment and opinion.

Justice Burke took no part in the decision.

## OPINION

Plaintiff, 1350 Lake Shore Associates (LSA), owns property located at 1320-30 North Lake Shore Drive in Chicago. In 1978, the Chicago city council approved an amendment to the Chicago zoning ordinance establishing Residential Planned Development 196 (RPD 196) for the property. When LSA sought to develop the property in 1997 by constructing a 40-story apartment building containing 196 dwelling units, it encountered resistance from a neighborhood group opposed to the construction of high-rise buildings in the area

surrounding LSA's property. On December 10, 1997, Charles Bernardini, then alderman of the 43rd Ward, in which the property is located, introduced a down-zoning ordinance in the city council to change the property's zoning from RPD 196 to R6 General Residence District. Under the latter zoning classification, LSA's proposed building was not a permitted use. The ordinance was approved by the city council in April 1998 and it became effective the following month. This case has been in litigation since 1998, when LSA filed a complaint for *mandamus*, seeking to require city officials to issue a zoning certificate and building permit under the RPD 196 zoning classification. The dispute has spawned three appellate court decisions. In the instant appeal, the appellate court affirmed the Cook County circuit court's conclusion that LSA did not gain a vested right to build under the former RPD 196 zoning. 363 Ill. App. 3d 806. We granted LSA's petition for leave to appeal. 210 Ill. 2d R. 315.

## BACKGROUND

In 1996, LSA authorized its agent, Draper & Kramer (Draper), to look into the possibility of developing the property under the RPD 196 zoning classification. In early 1997, LSA authorized Draper to proceed with the project. Draper hired Jack Guthman, an attorney specializing in zoning law, to represent LSA in connection with the project, and an architectural firm to develop the plans. Draper also hired a surveyor, an urban planner, an elevator consultant, and an artist to create a rendering based upon the architect's plans. In April or May 1997, Guthman and representatives of Draper met with Bernardini. They discussed the proposed project and Bernardini was shown the preliminary building designs. Bernardini requested that the number of parking spaces be increased and that some changes be made to the building's facade. While Bernardini testified that he did not mention down zoning the property at this meeting, he informed Guthman and the Draper representatives that the project would be controversial due to its size and density and that if they wanted his support, they should meet with neighborhood representatives and reach an agreement. Pursuant to Bernardini's suggestion, Draper instructed the architect to revise the building's plans to add more parking spaces and change the design of the building's facade.

The timing of the next meeting between Guthman and Bernardini was the subject of dispute. LSA claimed that it took place on August 1, 1997, while defendants argued that it took place shortly after the first meeting. Bernardini testified that he and Guthman talked periodically after the first meeting and that shortly after that meeting, Bernardini told Guthman that he was receiving complaints from neighbors about the project, that he had been asked to down zone the property, and that down zoning was a consideration if LSA and the neighbors could not reach a compromise.

In October 1997, Draper representatives met with Bernardini and showed him the revised plans for the building. Bernardini again urged them to show the plans to community representatives. On October 22, 1997, at a chance meeting with Guthman, Bernardini again urged the need for compromise. In early November 1997, Draper's president met with members of the Near North Preservation Coalition (NNPC), a neighborhood group opposed to the building project. No agreement was reached and on November 17, 1997, the group met with Bernardini and requested that he introduce a down-zoning ordinance. Upon learning of Bernardini's plan to introduce the ordinance, Guthman requested that Bernardini delay introducing the ordinance, stating that he believed real progress was being made by Draper and NNPC. Bernardini agreed to wait until the next city council meeting. When no agreement had been reached by that time, Bernardini introduced the down-zoning ordinance on December 10, 1997. The architect submitted a Part II Submittal for the project to the City's department of planning and development (Department). Despite meetings between Draper and NNPC on several occasions thereafter, no compromise was reached. On April 29, 1998, the city council approved the down-zoning ordinance. The Department did not issue a Part II approval letter. Issuance of this approval was a prerequisite to the issuance of a zoning certificate and building permit.

In August 1998, LSA filed a complaint for *mandamus* against the City and the commissioner of the Department to require the commissioner to issue a Part II approval. Subsequently, certain individuals who lived within 250 feet of LSA's property were allowed to intervene. Following a trial, the circuit court ruled in favor of defendants and the intervenors, finding that the Part II approval letter need not be issued because a down-zoning ordinance was pending

before the city council. On appeal, the appellate court concluded that the circuit court's reliance on the pending-ordinance doctrine was erroneous and it remanded with directions to issue a writ of *mandamus* requiring that a Part II approval letter be issued. *1350 Lake Shore Associates v. Hill*, 326 Ill. App. 3d 788 (2001).

On remand, the intervenors filed a motion for declaratory judgment seeking a declaration that LSA was not entitled to a zoning certificate or a building permit. LSA filed an amended complaint, seeking to require the City's zoning administrator to issue a zoning certificate and asking that the City be enjoined from interfering with LSA's rights under RPD 196. Although the circuit court ordered that a Part II approval letter be issued, it held, based on the evidence submitted at the earlier trial, that LSA did not have a vested right to the issuance of a zoning certificate or building permit. The circuit court found that expenditures incurred by LSA in connection with the project were not made in good-faith reliance on the RPD 196 zoning classification, but were made in an effort to reach a compromise. LSA again appealed.

The appellate court found that LSA's vested-rights claim required additional fact-finding and remanded to the circuit court with directions to make specific findings as to (1) the date on which LSA knew or should have known that it was probable Bernardini would introduce a down-zoning ordinance; (2) the total amount of expenses incurred by LSA in connection with the project as of that date; and (3) whether those expenses were sufficiently substantial to give LSA a vested right to the issuance of a zoning certificate and building permit under the RPD 196 zoning classification. *1350 Lake Shore Associates v. Mazur-Berg*, 339 Ill. App. 3d 618 (2003).

On remand, the circuit court made the following findings: (1) LSA knew it was probable that Bernardini would introduce a down-zoning ordinance on any date after the meeting in April or May 1997 involving Guthman, the Draper representatives, and Bernardini; (2) as of that date, LSA had incurred expenditures in the amount of $18,900.16 in connection with the project; and (3) the expenses were insufficiently substantial to give rise to a vested right in LSA to the issuance of a zoning certificate and a building permit for its project. LSA once again appealed.

The appellate court affirmed the circuit court's judgment, finding that LSA was not entitled to an order enjoining the City from applying the existing zoning ordinance, which would prevent LSA from developing the property under the RPD 196 zoning, and concluding that the intervenors were entitled to a declaratory judgment that LSA was not entitled to a zoning certificate or building permit under RPD 196. 363 Ill. App. 3d at 823.

ANALYSIS

I

*Mandamus* is an extraordinary remedy appropriate to enforce the performance of official duties by a public officer where no exercise of discretion is involved. *People ex rel. Birkett v. Jorgensen*, 216 Ill. 2d 358, 362 (2005), quoting *Madden v. Cronson*, 114 Ill. 2d 504, 514 (1986). There must be a clear right to the relief requested, a clear duty in the public officer to act, and a clear authority in the officer to comply with the writ. *Noyola v. Board of Education of City of Chicago*, 179 Ill. 2d 121, 133 (1997). A decision to grant or deny *mandamus* will not be reversed on appeal unless it is against the manifest weight of the evidence. *Pioneer Trust & Savings Bank v. County of Cook*, 71 Ill. 2d 510, 516-17 (1978). We review conclusions of law *de novo*. See *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002).

II

LSA first argues that the circuit and appellate courts erred in finding that it did not have a vested right to develop its property in accordance with the provisions of RPD 196. It argues it earned that right through its development efforts and substantial expenditures incurred prior to any official action that could have changed the zoning classification of the property. The City defendants argue that the circuit court's findings were not against the manifest weight of the evidence; intervenors argue that LSA is not entitled to a vested right in the RPD 196 zoning classification as a matter of law.

The general rule is that a landowner has no right to the continuation of an existing zoning classification. *Pioneer Trust*, 71 Ill. 2d at 517. However, an exception to this rule exists which this court

first recognized in *Fifteen Fifty North State Building Corp. v. City of Chicago*, 15 Ill. 2d 408, 416 (1958). This exception has been described as follows:

> "[W]here there has been a substantial change of position, expenditures or incurrence of obligations made in good faith by an innocent party under a building permit or in reliance upon the probability of its issuance, such party has a vested property right and he may complete the construction and use of the premises for the purposes originally authorized, irrespective of subsequent zoning or a change in zoning classification." *People ex rel. Skokie Town House Builders, Inc. v. Village of Morton Grove*, 16 Ill. 2d 183, 191 (1959).

The appellate court in the instant case explained that the determination of whether a vested right exists turns on the resolution of two questions: (1) which of the expenditures made or obligations incurred by the property owner were made in good-faith reliance on the probability that the owner would obtain the necessary clearances to develop the property; and (2) whether those expenditures or obligations were substantial. According to the court, central to the first inquiry is the proposition that, "once a property owner becomes aware that it is probable that an amendatory zoning ordinance will be introduced, it can no longer be said to be able to rely in good faith on the probability that a zoning certificate or a building permit will issue pursuant to the property's current zoning." 363 Ill. App. 3d at 814-15. The appellate court cited its decision in *Mazur-Berg* as authority for this last statement.

In *Mazur-Berg*, the court acknowledged that there is no bright-line test for determining whether expenditures have been made in good-faith reliance on the probability that a zoning certificate or building permit will issue. Based upon its review of the case law in this area, the court then fashioned the test it applied in the instant case, relying principally on three cases to support its determination that good-faith reliance ends when there is a probability that an amendatory zoning ordinance will be introduced. In *American National Bank & Trust Co. of Chicago v. City of Chicago*, 19 Ill. App. 3d 30 (1974), the owner applied for a building permit to construct a high-rise building east of Lake Shore Drive in Chicago. The city refused to issue the permit. Five days after application for the

permit, an ordinance was introduced to the city council that would prohibit any further private development east of Lake Shore Drive. The city argued that there was widespread publicity concerning the proposed zoning amendment and that the owner was on notice of a likelihood of a change in the law; accordingly, the owner did not rely in good faith on the probability of obtaining a building permit. In addressing this contention, the appellate court noted:

> "As a practical matter, of course, a proposed amendment may counter the applicant's argument of reliance on the probability a permit would issue, such that a change of position, etc., after knowledge of the proposal would not be included in a test of substantiality of change, expenditures, etc., which go to establish the vested right to issuance of a permit." *American National Bank*, 19 Ill. App. 3d at 34.

The court noted that it was the city's burden to show that the plan which would change the zoning was known to the owner prior to the time that substantial expenditures were made and that the city had made no such showing. The court found no evidence that awareness of the plan preceded the owner's expenditures. *American National Bank*, 19 Ill. App. 3d at 35-36.

Another case relied on by the appellate court in *Mazur-Berg* is *People ex rel. Shell Oil Co. v. Town of Cicero*, 11 Ill. App. 3d 900 (1973). There, the petitioners told the Cicero town clerk that they intended to construct a gasoline station on their property. Shortly thereafter, the clerk informed the petitioners' agent that the town's board of trustees objected to this proposal. That sentiment was confirmed by the trustees in a subsequent meeting with the agent, but the town clerk advised the agent to make a formal request for a building permit. The town trustees denied the application. Nonetheless, the petitioners proceeded with the demolition of the existing building on the property. A few months after a *mandamus* action was filed by the petitioners, the town amended its zoning ordinance. The circuit court issued the writ directing respondents to issue the building permit for the gasoline station. The appellate court reversed, concluding that the petitioners had not incurred substantial expenditures in reliance on the probability of receiving a building permit. With respect to the cost of demolition, the court noted that this expense was incurred at a time when the probability that a permit

would issue was doubtful and the likelihood of an amendatory ordinance seemed quite probable. *Shell Oil*, 11 Ill. App. 3d at 905.

In *Naumovich v. Howarth*, 92 Ill. App. 2d 134 (1968), another case relied on in *Mazur-Berg*, in anticipation of a request for a building permit to construct a gasoline station, the City of Springfield passed a resolution referring the question of reclassification of all property in an area, including the subject property, to the zoning board of appeals for public hearing and recommendation. The resolution also directed that no building permit other than for residential construction should be issued. A week later, plaintiffs submitted their application for a building permit for the gasoline station. The request was refused due to the resolution. Shortly thereafter, the city passed an amendatory ordinance changing the zoning classification of the subject property. The appellate court noted the factors to be considered in deciding whether one has a vested right in the existing zoning of a property: (1) a substantial change of position before an orderly change in the law; (2) a notice of likelihood of change in the law prior to a change in the property owner's position; (3) the regularity of the proceeding of the municipality in making the change; and (4) the promptness with which the municipality takes action. The court found no substantial change in position prior to the passage of the ordinance that changed the zoning of the property. *Naumovich*, 92 Ill. App. 2d at 139-40.

From these cases, the *Mazur-Berg* court concluded that once a property owner becomes aware of the probability that an amendatory zoning ordinance will be "introduced," the owner can no longer rely in good faith on the probability that a zoning certificate or building permit will issue under the property's then-existing zoning. *Mazur-Berg*, 339 Ill. App. 3d at 634.

The *Shell Oil* and *Naumovich* cases cited by *Mazur-Berg* and, by extension, the appellate court in the instant appeal do not support the proposition that it is the probability of introduction of an amendatory zoning ordinance that is the cut off point for good-faith reliance. In *Shell Oil*, the town trustees, who were responsible for approving building permits and enacting zoning changes, told the petitioners that they did not want a gasoline station to be constructed on the property. Thus, petitioners were on notice from the very officials responsible for granting or denying applications for building permits that it was

unlikely they would receive a building permit to construct the gasoline station. Only after the *mandamus* action was filed did the town amend its zoning ordinance, and there is no discussion in the opinion as to any events that may have preceded that amendment. In *Naumovich*, the city council passed a resolution on the question of zoning reclassification of property, including the parcel of property at issue, recommending that the property be reclassified as residential. Only after this official action had been taken did the property owner submit an application for a building permit to construct a gasoline station.

The City asserts in its brief that no court has ever suggested that the requisite knowledge of the zoning change must come from a public hearing or the actual introduction of a zoning amendment. However, neither the City nor the intervenors have cited any cases that could be construed as holding that good-faith reliance ends when one city council member raises the possibility of introducing a down-zoning ordinance if the property owner does not reach agreement with neighborhood organizations. It is the position of the City and the intervenors that the first time Bernardini mentioned down zoning, LSA could no longer rely in good faith on the probability that it would be granted a building permit under the RPD 196 zoning classification. The trial court found that Bernardini first raised this possibility shortly after his initial meeting with representatives of LSA in April or May 1997. The parties continued to meet during the next several months. LSA submitted revised building plans, at Bernardini's request, adding parking spaces, changing the facade of the building, and reducing the density of the building, all in an effort to reach a compromise with concerned neighbors. Although Bernardini may have mentioned down zoning shortly after his initial meeting with LSA representatives, he continued to urge LSA to reach a compromise with neighbors. The appellate court concluded that it was at the meeting shortly after the spring 1997 meeting that LSA knew or should have known that, "regardless of the success of any attempts at reaching a compromise with community members, it could no longer rely in good faith on the probability that it would be issued a zoning certificate and building permit in accordance with RPD 196." 363 Ill. App. 3d at 817. The circuit court came to an identical conclusion, reasoning that once Bernardini told Guthman that down zoning was a consideration unless a compromise with neighbors was reached, LSA could not rely on the

-9-

probability that it would receive its building permit. Accordingly, any expenditures made without securing an agreement could not be construed as being made in good faith. The circuit court was concerned that any other interpretation would allow a developer to manipulate the date of compromise or impasse and thus render the concept of good faith meaningless.

The conclusion reached by the circuit and appellate courts, however, could lead to manipulation by objecting neighbors and may discourage property owners from seeking to develop their property. Neighbors who object to proposed construction may pressure their political representative to make early threats to down zone unless the owner compromises. The neighbors may then later refuse to compromise and request their representative to introduce a down-zoning ordinance, confident in the knowledge that the owner could have gained no vested right to build under the property's former zoning. A standard that may be subject to manipulation by either party is unworkable. Further, the conclusions reached by the circuit and appellate courts here assume that the only type of building LSA could construct under the RPD 196 zoning classification is the one originally conceived. As LSA points out, however, that classification merely set requirements for maximum floor area ratio and land coverage, established setback and yard requirements, established the minimum number of parking spaces, and limited the overall number of units. Thus, it may have been possible to compromise on a different type of structure, had the parties been willing.

The City argues that no case exists in which good-faith reliance was found despite the plaintiff's knowledge that a zoning change was pending and it refers repeatedly in its brief to "pending zoning change," "impending amendment," "impending zoning change" to describe the point at which LSA's good-faith reliance on the existing zoning ended. However, no zoning change was "pending" until Bernardini introduced the down-zoning ordinance on December 10, 1997. *American National Bank* does not support the City's position. There, the property owners' expenditures and contractual obligations largely preceded the public release of the zoning plan on which the proposed amendment was based. In contrast to the situation in the instant case, the zoning plan in *American National Bank* was in existence and pending before the city council. The actual ordinance

that changed the zoning was not introduced until after the owners had submitted their application for a building permit. There is nothing in *American National Bank* that suggests a property owner may be precluded from gaining a vested right merely because one city council member expresses an intent to introduce a down-zoning ordinance at some future time.

Other cases cited by the City are not to the contrary. In *Kramer v. City of Chicago*, 58 Ill. App. 3d 592, 597 (1978), the amendatory zoning ordinance had been enacted more than two years before a building permit was applied for. The appellate court noted that the owner at the very least had constructive notice of the change in zoning and thus could not have relied on the probable issuance of a building permit. In *People ex rel. National Bank of Austin v. County of Cook*, 56 Ill. App. 2d 436 (1965), the only issue was the substantiality of the plaintiff's claimed expenditures. There was no discussion in the appellate court's opinion on the issue of when the plaintiff could no longer rely on the probability of obtaining a building permit for its project. In *Chicago Title & Trust*, a proposed change in the property's zoning classification was pending before the municipality's zoning authorities, on which public hearings had been held over a period of several months. The appellate court noted that it would be illogical to hold that one could gain a vested right to build under the existing zoning classification merely by filing an application for a building permit, where a comprehensive zoning ordinance was under consideration by the municipality and on which public hearings had been held. *Chicago Title & Trust Co. v. Village of Palatine*, 22 Ill. App. 2d 264, 270 (1959). *VonBokel v. City of Breese*, 100 Ill. App. 3d 956 (1981), did not discuss the vested-rights doctrine; rather, the case turned on principles of equitable estoppel based upon alleged assurances by the municipality regarding approval of the plaintiff's subdivision plat if certain changes were made.

We conclude that when considering whether a property owner has gained a vested right to build under the property's then-existing zoning classification, the starting point for the analysis must be the point at which some official action took place that could result in a change in the property's zoning. At a minimum, this would require actual introduction of a proposal to the appropriate zoning authorities which, if enacted into law, would change the property's existing

zoning to a classification that would not allow construction of the property owner's building project. In the instant case, Bernardini introduced his down-zoning proposal to the city council on December 10, 1997. This action followed several months of changes in the building's design in an effort to satisfy concerns raised by Bernardini and reach a compromise with objecting neighbors. Only when it was determined that no agreement would be reached did Bernardini introduce the down-zoning ordinance. At that point, LSA knew or should have known that it was not probable it would obtain a building permit for its project.

The circuit court limited its consideration of LSA's expenditures to those incurred up to a date shortly after Bernardini's April or May 1997 meeting with Guthman and representatives of Draper. Having determined that the circuit and appellate courts erred in identifying the date on which LSA knew or should have known that it would probably not receive the necessary approvals to complete its project, we conclude that this cause must be remanded to the circuit court for a determination as to the expenditures and/or obligations incurred by LSA up to December 10, 1997.


III

LSA takes issue with some of the findings of the circuit court regarding the expenditures to be counted in determining whether LSA had a vested right to build under the RPD 196 zoning. We note that we will not disturb the trial court's findings of fact unless they are contrary to the manifest weight of the evidence. *Pioneer Trust*, 71 Ill. 2d at 516-17. The only specific argument LSA makes regarding the circuit court's findings on its expenditures is that it should have been credited for the amounts paid by Draper to its employees for work done on the building project. LSA argued that the employees performed 738 hours of work for a total expenditure of $100,287.50. The circuit court rejected LSA's claim, relying on *National Bank of Austin*. The court in that case refused to credit $1,600 of salary payments to the plaintiff's employees, finding that the employees would have been paid regardless of whether they worked on the building project. *National Bank of Austin*, 56 Ill. App. 2d at 448. LSA seeks to distinguish that case by noting that the employees here work for Draper, not for LSA. It also argues that the record shows that

those employees might not have been kept on the payroll absent LSA's building project. However, the appellate court noted that the only witness to testify concerning this issue stated that without LSA's project, the employees would either have worked on other projects or would not have been retained, "one of the two." 363 Ill. App. 3d at 821. The appellate court found this evidence to be speculative and therefore insufficient to show that payments to Draper's employees should be counted toward LSA's expenditures. We agree and conclude that the circuit court's finding on this issue was not against the manifest weight of the evidence.

IV

LSA also argues that the appellate court erred in devising a test to determine whether LSA's expenditures were substantial. The appellate court found very little assistance in the case law on how to determine the issue of substantiality. Nonetheless, the court concluded that the following factors are relevant in making a substantiality determination: (1) a comparison of the expenses incurred to the total projected cost of the development; (2) purchase price of the land; (3) the character of the entity incurring the costs (individual homeowner versus a large developer); and (4) any other factor that may be deemed relevant to the question of substantiality. Finally, the appellate court held that courts should employ a "totality-of-circumstances approach, rather than measure substantiality in terms of absolute dollars only." 363 Ill. App. 3d at 822-23. In applying these factors, the court took into account an additional $17,400 that LSA claimed the circuit court ignored in calculating the expenditures incurred, for a total of $36,300 in expenses. The court noted that the estimated value of the land was $6 million and the projected cost of the development was $70 million. The court also considered the character of LSA and found that it was not an entity for whom $36,300 would be considered a substantial expenditure. Thus, the court affirmed the circuit court's finding that LSA's expenses were not sufficiently substantial to give rise to a vested right. 363 Ill. App. 3d at 823. We have held that the circuit and appellate courts erred in their vested-rights analysis. On remand, the circuit court must determine the amount of LSA's expenditures up to December 10, 1997, the date on which Bernardini introduced the down-zoning ordinance to the city council. The court will again have

to make a determination as to whether those expenditures were sufficiently substantial to give LSA a vested right to complete its project. Accordingly, we consider the issue of substantiality.

One of the factors to be considered, according to the appellate court, is a comparison of the amount spent in good-faith reliance on a proposed development with the projected costs of the development. 363 Ill. App. 3d at 822. This is the concept of proportionality. LSA argues that proportionality should not be considered, citing *American National Bank*. The court in that case stated that it is the rule in Illinois that substantiality is determined without regard to any proportionality test and by considering the cost of the land. *American National Bank*, 19 Ill. App. 3d at 34. In support, the court cited *National Bank of Austin*, 56 Ill. App. 2d 436. However, the latter case did not discuss the issue of proportionality of expenditures. Other cases have also not used a proportionality calculation when deciding whether expenditures were substantial. See, *e.g.*, *Illinois Mason Contractors, Inc. v. City of Wheaton*, 19 Ill. 2d 462 (1960) (loan commitment of $50,000, a contract for work totaling $30,000, and expenditures of $5,600); *People ex rel. Skokie Town House Builders, Inc. v. Village of Morton Grove*, 16 Ill. 2d 183 (1959) (land purchased for $26,000, expenditures of $1,830); *Fifteen Fifty North State Building Corp. v. City of Chicago*, 15 Ill. 2d 408 (1958) ($105,000 architectural contract and $5,100 in expenses); *O'Connell Home Builders, Inc. v. City of Chicago*, 99 Ill. App. 3d 1054 (1981) ($12,000 architectural fee and $5,500 for tree removal); *Mattson v. City of Chicago*, 89 Ill. App. 3d 378 (1980) (demolition of plaintiff's home worth more than $40,000 and expenditures of $4,100); *Deer Park Civic Ass'n v. City of Chicago*, 347 Ill. App. 346 (1952) (land purchased for $41,000, contractual liabilities incurred of over $597,000, and extensive construction work performed). In these cases, the expenses were not compared to anything; they were declared to be substantial based upon the amount alone.

Defendants argue that proportionality is a proper consideration in determining whether expenditures are substantial. In support of this argument, they cite *Zeitz v. Village of Glenview*, 304 Ill. App. 3d 586 (1999). The appellate court in that case found that the plaintiffs did not establish a probability that the village would approve their subdivision plan and that, even assuming they had made such a

-14-

showing, the amount of their expenditures, in comparison to the property's value of more than $1 million, failed to establish detrimental reliance. *Zeitz*, 304 Ill. App. 3d at 594. This statement, however, was not necessary to the court's holding and is properly termed *dicta*. Nonetheless, we agree with defendants and with the appellate court below that proportionality is a factor to be considered in the substantiality analysis. The purpose of the vested-rights doctrine is to mitigate the unfairness caused by a zoning change when a property owner has made a substantial change of position in good-faith reliance on the probability of obtaining a building permit. See *Cos Corp. v. City of Evanston*, 27 Ill. 2d 570, 576-77 (1963). Whether a change of position is substantial depends on the facts of each case. It is not possible to properly make this determination by considering only the objective amount of expenditures in a vacuum. Necessarily, then, one must consider not only the amount of expenditures, but also factors that make each case unique. One of these factors is, as the appellate court held, the projected cost of the development. Other factors, such as the nature or character of the person or entity seeking to develop the property and the cost of the land are also appropriate considerations in deciding whether expenditures are substantial. There may, as well, be other factors in individual cases that a court may properly consider. None of these factors should be viewed in isolation; rather, as the appellate court noted, it is the totality of the circumstances that will determine whether expenditures in any given case are deemed to be substantial. Thus, we agree with the formulation set forth by the appellate court with respect to making a determination of substantiality.


V

LSA argues that the circuit and appellate courts erroneously placed the burden of proof on it to show the date on which it knew or should have known it was probable that Bernardini would introduce a down-zoning ordinance. Questions regarding the burden of proof are questions of law and are reviewed *de novo*. See *People v. Lindsey*, 199 Ill. 2d 460, 471 (2002). In its fourth amended complaint, LSA requested that a writ of *mandamus* issue to the City of Chicago zoning administrator to issue a zoning certificate, certifying that the plans submitted as part of LSA's Part II application conform to the

RPD 196 zoning. To be entitled to a writ of *mandamus*, the plaintiff must establish a clear right to relief, a clear duty of the public official to act, and a clear authority in the public official to comply with the writ. *People ex rel. Madigan v. Snyder*, 208 Ill. 2d 457, 465 (2004). The burden rests on the plaintiff to show a clear legal right to issuance of the writ. *Chicago Ass'n of Commerce & Industry v. Regional Transportation Authority*, 86 Ill. 2d 179, 185 (1981). On April 29, 1998, the Chicago city council approved the down-zoning ordinance introduced by Bernardini, changing the zoning of LSA's property from RPD 196 to R6 General Residence District. On August 25, 1998, LSA filed the instant action. Under the property's then-existing zoning classification, R6 General Residence District, LSA's proposed building project was not a permitted use. Accordingly, to be entitled to the zoning certificate and building permit it sought, LSA had to establish a vested right to build under the former RPD 196 zoning ordinance. Absent proof of a vested right, LSA's *mandamus* complaint must fail.

LSA asserts that Illinois property owners have never before been saddled with a duty to continuously prove an ongoing right to rely on the law that was enacted specifically to govern their conduct. However, we have noted that property owners have no vested right to the continuation of existing zoning laws. *Pioneer Trust*, 71 Ill. 2d at 517. That principle of law may be overcome only if a property owner establishes a vested right to build under the property's former zoning. In support of its argument that defendants have the burden of proving the point at which LSA's good-faith reliance ended, LSA relies on *American National Bank*. Although some language in that case can be read as shifting the burden of proof to the party opposing the plaintiff's claim to a vested right, it can also be read as simply noting that, once the plaintiff has established a material change of position in reliance on the probability that a building permit would issue, the defendant must come forward with some proof to the contrary. See *American National Bank*, 19 Ill. App. 3d at 36 ("The record shows that the petitioners expended substantial sums in reliance on the probability a permit would issue. Having established their right to a writ, it was for the respondents to show that the petitioners did not rely on existing zoning at the time the expenditures were made"). One way to make this showing would be to demonstrate

that the plaintiff was aware of a proposed or actual zoning change at the time the expenditures were made. This does not, however, shift the burden of proof to the defendant; rather, the defendant must, as in any other case, put forth evidence to counter the plaintiff's proof. We conclude that the courts below did not err in placing the burden on LSA to demonstrate a vested right to build under the RPD 196 zoning.

## VI

LSA argues that under the City's zoning ordinance and regulations, it was entitled to a zoning certificate and building permit once the City issued its Part II approval letter. Thus, according to LSA, the prior-pending-ordinance doctrine does not apply to permit the City to withhold the necessary approvals on the building project. The City argues, and we agree, that LSA has forfeited this issue because it did not include the issue in its petition for leave to appeal. Failure to include an issue in a petition for leave to appeal results in forfeiture of that issue for review. *People v. Carter*, 208 Ill. 2d 309, 318 (2003). Accordingly, we decline to consider this argument.

## CONCLUSION

For the reasons stated, we reverse the judgments of the circuit court and the appellate court and remand to the circuit court for a determination of the amount of expenses incurred by LSA as of December 10, 1997 and whether those expenses were sufficiently substantial to give LSA a vested right to develop its building project under the former RPD 196 zoning classification.

*Appellate court judgment reversed;*
*circuit court judgment reversed;*
*cause remanded.*

JUSTICE BURKE took no part in the consideration or decision of this case.