# Illinois Official Reports

## Appellate Court

---

*Clarke v. Community Unit School District 303,*
2014 IL App (2d) 131016

---

| | |
|---|---|
| Appellate Court Caption | J. LYELL CLARKE and STEVEN SCHULZE, Plaintiffs-Appellants and Cross-Appellees, v. COMMUNITY UNIT SCHOOL DISTRICT 303, Defendant-Appellee and Cross-Appellant. |
| District & No. | Second District<br>Docket No. 2-13-1016 |
| Filed | December 3, 2014 |
| Rehearing denied | January 8, 2015 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from a writ of *mandamus* requiring defendant school district to deal with its failure to cure its inability to comply with the No Child Left Behind Act, the School Code, and regulations adopted under the Code, the appellate court upheld the trial court's grant of the district's motion to vacate the order granting the writ of *mandamus* ordering compliance with the Act, the Code, and the regulations, and remanded the cause with directions to reconsider the matter in light of the United States Department of Education's approval of Illinois's interim request for a waiver from the mandates of the Act. |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 11-CH-1250; the Hon. David R. Akemann, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part; cause remanded. |

| Counsel on Appeal | Timothy P. Dwyer, of Law Offices of Timothy P. Dwyer, of St. Charles, for appellants. |
|---|---|
| | S. Bennett Rodick and Jennifer A. Mueller, both of Hodges, Loizzi, Eisenhammer, Rodick & Kohn, LLP, of Arlington Heights, for appellee. |
| Panel | JUSTICE SPENCE delivered the judgment of the court, with opinion. Justice Zenoff concurred in the judgment and opinion. Justice McLaren dissented, with opinion. |

**OPINION**

¶ 1    Plaintiffs, J. Lyell Clarke and Steven Schulze, appeal the trial court's issuance of a writ of *mandamus* with respect to the reorganization of two schools. Plaintiffs argue that the trial court erred by issuing a writ of *mandamus* that did not reinstate the boundaries of the two schools to their original status prior to the reorganization. In the alternative, plaintiffs argue that the trial court erred by issuing a writ of *mandamus* that did not order a major restructuring of the two schools. Defendant, Community Unit School District 303, cross-appeals, arguing that the trial court erred by ordering the relief it did in the writ of *mandamus*. Defendant also moves to vacate the trial court's order and dismiss the appeal as moot based on a waiver of certain provisions in the No Child Left Behind Act of 2001 (NCLB) (20 U.S.C. § 6301 *et seq.* (Supp. I 2001)). We affirm in part, vacate in part, and remand the case with directions.

¶ 2                                    I. BACKGROUND
¶ 3    This case involves the reorganization of two schools, Davis Elementary and Richmond Elementary, that both, prior to the 2011-12 school year, served students in kindergarten through fifth grade. Plaintiffs are parents of students who originally attended Davis. Defendant is a school district organized under the Illinois School Code (School Code) (105 ILCS 5/1-1 *et seq.* (West 2010)). Beginning in the 2011-12 school year, defendant reconfigured the schools so that Davis served students in kindergarten through second grade and Richmond served students in third through fifth grades (2011 Plan).

¶ 4    This case comes before us a second time after we held that plaintiffs' complaint contained sufficient allegations for a writ of *mandamus* based on violations of the School Code and its regulations and we remanded the matter to the trial court. *Clarke v. Community Unit School District 303*, 2012 IL App (2d) 110705, ¶¶ 25, 41 (*Clarke I*). Consistent with *Clarke I*, the trial court issued a writ of *mandamus*. The court found that the 2011 Plan failed to comport with the NCLB and the specific provisions of the School Code (105 ILCS 5/2-3.25d (West 2010)) and its regulations implementing the NCLB. However, the remedy ordered by the court left intact the reconfiguration of the two schools, despite plaintiffs'

request that the court reinstate the schools' boundaries to their original status prior to the implementation of the 2011 Plan.

¶ 5 We begin with a discussion of the relevant federal and state statutory provisions. Beginning with the NCLB, its overarching goal is "to ensure that all children have a fair, equal, and significant opportunity to obtain a high-quality education and reach, at a minimum, proficiency on challenging State academic achievement standards and state academic assessments." 20 U.S.C. § 6301 (Supp. I 2001). In addition, the NCLB seeks to close the "achievement gap between high- and low-performing children, especially the achievement gaps between minority and nonminority students, and between disadvantaged children and their more advantaged peers." 20 U.S.C. § 6301(3) (Supp. I 2001). The NCLB requires states to establish and enforce learning standards and to achieve adequate yearly progress (AYP) toward those standards, as measured by federally approved standardized tests. See 20 U.S.C. § 6311 (Supp. II 2002).

¶ 6 Under several of its provisions, the NCLB provides for federal educational grants to states and schools, known as "Title I" funds. 20 U.S.C. § 6301 *et seq*. (Supp. I 2001). Specifically, Title I funds are used to supplement the educational needs of disadvantaged students. *Id.* The Secretary of Education has the authority to withhold federal funds if a recipient of funds fails to comply substantially with the NCLB's requirements. See 20 U.S.C. § 1234c (Supp. II 2002).

¶ 7 To comply with the NCLB, the Illinois General Assembly amended sections of, and added sections to, the School Code (Pub. Act 93-470, § 5 (eff. Aug. 8, 2003)). Most notably, Public Act 93-470, section 5, significantly amended section 2-3.25d of the School Code (105 ILCS 5/2-3.25d (West 2010)). Section 2-3.25d(a) provides that a school that fails to meet AYP for two consecutive years is placed on "academic early warning status for the next school year." 105 ILCS 5/2-3.25d(a) (West 2010). If the school fails to meet AYP for a third consecutive year, it remains on academic early warning status. *Id*. If the school fails to meet AYP for a fourth consecutive year, it is placed on "initial academic watch status." *Id*. If the school remains on academic watch status after a fifth year, the school district must develop a restructuring plan for the school. *Id*. Section 2-3.25d(a) provides, "A school district that has one or more schools on academic early warning or academic watch status shall prepare a revised School Improvement Plan [(SIP)] ***." *Id*. Further, section 2-3.25d(c) provides that a SIP "shall be developed in collaboration with parents ***. *** The *** [SIP] shall address measurable outcomes for improving student performance so that such performance meets [AYP] criteria ***." 105 ILCS 5/2-3.25d(c) (West 2010).

¶ 8 In this case, for four consecutive school years, 2007-08 through 2010-11, Richmond failed to achieve AYP. Richmond failed to achieve AYP because some of its students were "limited English proficient" (LEP). Once Richmond failed to make AYP for the second consecutive school year, 2008-09, defendant developed a SIP for Richmond in 2009. Defendant was required to notify the parents of Richmond students of the AYP issue and to offer those parents the option to enroll their children in higher performing schools within the district (this option is known as "choice"). By the following school year, 2010-11, 117 Richmond students had transferred to other schools in the district and the enrollment at Davis had increased by 19 students. Davis had achieved AYP every school year prior to 2010-11.

¶ 9 On February 7, 2011, a "robocall" went out to the parents of students at Richmond and Davis, informing them of significant changes at the two schools. Parent open-house meetings

- 3 -

were held on February 9 and 10, 2011, and the 2011 Plan to combine Richmond and Davis was adopted by defendant in March 2011. The 2011 Plan reconfigured Richmond and Davis, both Title I schools, from two independent elementary schools, serving students in kindergarten through fifth grade, into interdependent elementary schools, with Davis serving students in kindergarten through second grade and Richmond serving students in third grade through fifth grade. After the fall of 2011, the parents of Richmond students no longer had the option of transferring their children to higher performing schools, because choice was no longer available.

¶ 10    Plaintiffs filed a complaint alleging that defendant's 2011 Plan was an unlawful SIP under the School Code and its regulations. *Clarke I*, 2012 IL App (2d) 110705, ¶¶ 10-12. Defendant moved for judgment on the pleadings; the trial court granted defendant's motion; and plaintiffs appealed. *Id.* ¶ 1. We reversed in part, stating that there was a genuine issue of material fact regarding whether the 2011 Plan was a SIP under the School Code. *Id.* ¶¶ 39, 41. Further, we held that plaintiffs had alleged sufficient facts to support a cause of action for a writ of *mandamus*, and we remanded the case to the trial court. *Id.* ¶¶ 25, 41.

¶ 11    On remand, plaintiffs filed a third amended complaint to include a cause of action for a writ of *mandamus*. Defendant answered plaintiffs' complaint, filed an amended answer with an affirmative defense, and also filed a counterclaim against plaintiffs and a third-party complaint against the Illinois State Board of Education (ISBE). Defendant sought a declaratory judgment finding that the 2011 Plan (1) was not a SIP and was not required to be a SIP pursuant to the School Code, and (2) did not violate section 2-3.25d of the School Code and regulations implementing the School Code. In addition, defendant argued that the 2011 Plan was within its "discretionary authority granted to it by the General Assembly to act as a policymaking body." On January 28, 2013, the trial court granted plaintiffs' motion to strike defendant's affirmative defense. On May 24, 2013, the trial court granted plaintiffs' and the ISBE's motion to dismiss defendant's counterclaim and third-party complaint pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2012)).

¶ 12    The court heard testimony, admitted other evidence, and heard argument of counsel during a seven-day trial held from July 24 through August 1, 2013. In its September 18, 2013, modified opinion and judgment order, the court first addressed the issue of whether the School Code and its regulations relating to the NCLB applied to defendant's 2011 Plan. According to the court, the 2011 Plan had many elements of a revised SIP, and defendant was required to comply with section 2-3.25d of the School Code and its regulations when implementing the 2011 Plan, but defendant did not do so. The court stated: "The District is required to adopt a Plan which will assist or otherwise benefit the failing subgroups. The 2011 Plan contained no measures whereby the failing subgroups were addressed."

¶ 13    The court also found that defendant developed the 2011 Plan "at least in part, to resolve [Richmond's] AYP issue." The court acknowledged that district personnel testified otherwise, but the court did "not find this testimony credible." The court stated that, although defendant "admittedly adopted a Plan for the general good," the 2011 Plan contained "no specific strategies for those subgroups [at Richmond] who failed AYP." The 2011 Plan failed to comply with the School Code and its regulations because it failed to: (1) "provide any measurable, scientific remedial strategies at Richmond[, which] did not pass that statewide ISAT test and failed AYP"; (2) "address why the 2009 SIP did not improve the AYP scores

of the failing subgroups"; and (3) provide choice to the parents of Richmond students. The court stated:

> "[O]nce Choice was implemented, the District cannot eviscerate past SIP failures by 'reconfiguring the school population.' This methodology only serves to circumvent the express requirements of the NCLB regulations. *** Under Section 5/2-3.25(d) [of the School Code], the District was obligated to adopt *a* Plan for Richmond School in 2011 for school years 2011-2013." (Emphasis in original.)

The court found that plaintiffs "have demonstrated that the 2011 Plan fails to comport with the applicable statutory and regulatory mandates of the NCLB, the [S]chool [C]ode and the regulations promulgated thereunder."

¶ 14    Regarding the remedy, the trial court noted that plaintiffs had requested that the 2011 Plan be declared null and void, which would " 'undo' " the reconfiguration and return the boundaries of both schools back to their original status prior to the implementation of the 2011 Plan. However, the court noted that this court had stated in *Clarke I* that a plaintiff will not be entitled to a writ of *mandamus* when its effect would be to substitute the court's judgment or discretion for that of the public official. *Clarke I*, 2012 IL App (2d) 110705, ¶ 24 (citing *Lewis E. v. Spagnolo*, 186 Ill. 2d 198, 229 (1999)). The court further noted that, while its role was to ensure compliance with the statutory and regulatory mandates, it must not determine on its own "whether or not the means ultimately adopted by [defendant] are wise or expedient nor interfere with the exercise of the powers by the members of [defendant] in matters confided to their discretion."

¶ 15    Accordingly, the court issued a writ of *mandamus* but did not undo the reconfiguration and return the schools to their original status. Instead, the writ of *mandamus* stated:

> "The Defendant District is ordered, within a period of six months from the date of this Judgment to develop a revised Corrective Action Plan that includes Choice and Supplemental Services (SES) in accordance with the mandates in the NCLB, the School Code 105 [ILCS] 5/2-3.25d and 23 Ill. Admin. Code, Sections 1.10-1.85 for students in the Davis and Richmond buildings. Without limitation to the foregoing, the Corrective Action Plan must be *developed* in collaboration with and the input of parents of students attending school in, and the staff serving in, the Davis and Richmond buildings." (Emphasis in original.)

¶ 16    Plaintiffs moved to reconsider and clarify the trial court's decision, requesting the court to mandate defendant to "undo its previous action of combining the attendance areas for the students who attended school in the Davis and Richmond buildings." In another written decision, the court denied plaintiffs' request to reconsider but granted their request for clarification.

¶ 17    Regarding the reconfiguration, the court stated that "boundary decisions are and remain the prerogative of the [defendant] school district." The court determined that it was "not the reconfiguration that the [defendant] school district did that, considered in isolation, was contrary to the mandates of the NCLB." Rather, it was defendant's "failure to provide the corrective action mandates that this Court now orders" that "ran contrary to the NCLB from which the State cannot provide a waiver." According to the court, its function "in *mandamus*" was not to "replace the quasi-legislative authority of the [defendant] district but to require that the [defendant] district perform its mandated functions as opposed to" prohibiting it from "performing discretionary functions."

¶ 18    The court also declined plaintiffs' alternative request that it mandate "restructuring as opposed to corrective action," based on Richmond's AYP failure for six years. The court stated that the "NCLB has a progressive step schematic to reach a mandated restructure requirement." It stated that, in "the absence of case law" indicating that a different result was required, "the better approach" was "to place the process on the track where it went off the track." "In this way, parents, staff, and the [defendant] District" could work together to achieve "the best result for the students," which was the "ultimate goal for any school program."

¶ 19    Plaintiffs timely appealed, seeking reversal of the remedy in the writ of *mandamus*. Defendant timely cross-appealed and sought reversal of the writ of *mandamus*. In particular, defendant appealed the court's finding that defendant "failed to comply with certain legal mandates" and the order that, "within six months of the date of judgment," it "must develop a revised Corrective Action Plan that includes Choice and Supplemental Education Services."

¶ 20    During the pendency of this appeal, the United States Department of Education approved Illinois's request for a waiver from the mandates of the NCLB (2014 waiver), which is effective for the 2014-15 school year. In a motion taken with the case, defendant relies on the 2014 waiver in urging this court to vacate the trial court's order and dismiss the appeal and cross-appeal as moot. Plaintiffs have filed an objection to defendant's motion, and we address the merits of the motion in the context of the arguments raised on appeal.

¶ 21                                II. ANALYSIS
¶ 22                              A. Reconfiguration
¶ 23    Plaintiffs do not challenge the findings of the trial court but argue only that the trial court erred in choosing a remedy. Plaintiffs question why the trial court viewed the reconfiguration part of the 2011 Plan in isolation and urge this court to reverse the remedy ordered by the trial court and order defendant to return Davis and Richmond to their status before the reconfiguration in the 2011 Plan took effect. Plaintiffs argue that the trial court's remedy is erroneous because it allows the 2011 Plan to remain intact, even though the trial court found the plan in violation of the School Code and its regulations.

¶ 24    Defendant counters that it had the discretion to reconfigure the schools and that there is nothing in the School Code or its regulations implementing the NCLB that prohibit it from reconfiguring a school or schools either before or after a school has failed to make AYP.

¶ 25    *Mandamus* is an extraordinary remedy to enforce the performance by a public officer of nondiscretionary official duties. *Noyola v. Board of Education of the City of Chicago*, 179 Ill. 2d 121, 133 (1997). The remedy provides affirmative rather than prohibitory relief and can be used to compel the undoing of an act. *People ex rel. Birkett v. Konetski*, 233 Ill. 2d 185, 193 (2009). Where public officials have failed to comply with mandatory statutory requirements, the purpose of *mandamus* is to compel public officials to do so. *Id*. Although *mandamus* may be used to compel a public officer to perform a duty that does not involve the exercise of discretion by the officer, *mandamus* will not issue to direct the manner in which a discretionary act is performed. *Turner-El v. West*, 349 Ill. App. 3d 475, 479-80 (2004).

¶ 26    Ordinarily, we will not disturb a trial court's decision to grant or deny a writ of *mandamus* unless its decision is against the manifest weight of the evidence. See *1350 Lake Shore Associates v. Healey*, 223 Ill. 2d 607, 614 (2006). However, in this case, the parties do

not contest the trial court's findings of fact but contest only the trial court's conclusions of law. Accordingly, the parties agree that our review is *de novo*. See *id*. (conclusions of law are reviewed *de novo*). Also, we are required to construe the School Code, and questions of statutory interpretation present questions of law. *Board of Education, Joliet Township High School District No. 204 v. Board of Education, Lincoln Way Community High School District No. 210*, 231 Ill. 2d 184, 194 (2008).

¶ 27    As we explain, the trial court properly issued a writ of *mandamus* that did not reinstate the school boundaries to their original status prior to the implementation of the 2011 Plan. Because the reconfiguration was within defendant's discretion, it would not have been proper to order *mandamus* relief to undo that part of the 2011 Plan. See *Burnidge Brothers Almora Heights, Inc. v. Wiese*, 142 Ill. App. 3d 486, 490 (1986) (*mandamus* does not issue to compel action that is discretionary).

¶ 28    The School Code contains both general, discretionary powers granted to school boards by the legislature (see 105 ILCS 5/10-20 (West 2010)) and mandatory regulations that specifically address a school district's duties as required by the NCLB (see 105 ILCS 5/2-3.25d (West 2010)). *Clarke I*, 2012 IL App (2d) 110705, ¶ 29. As we stated in *Clarke I*, the general, discretionary powers include the authority: "[t]o adopt and enforce all necessary rules for the management and government of the public schools" (105 ILCS 5/10-20.5 (West 2010)); "[t]o establish one or more attendance units within the district" (105 ILCS 5/10-21.3 (West 2010)); "[t]o assign pupils to the several schools in the district" (105 ILCS 5/10-22.5 (West 2010)); "[t]o have the control and supervision of all public schoolhouses in their district" (105 ILCS 5/10-22.10 (West 2010)); and "[t]o decide when a site or building has become unnecessary, unsuitable or inconvenient for a school" (105 ILCS 5/10-22.13 (West 2010)). *Clarke I*, 2012 IL App (2d) 110705, ¶ 26.

¶ 29    The general, discretionary powers of school boards were discussed in *Tyska v. Board of Education of Township High School District 214*, 117 Ill. App. 3d 917 (1983). There, the plaintiffs challenged the school board's decision to close one high school and assign incoming freshmen to a different high school. *Id*. at 918. Decreasing enrollment and increasing cost had made it necessary to close one or more of the eight schools within that district. *Id*. In order to determine which school(s) to close, the school board established a committee to develop criteria, and it solicited public opinion. *Id*. at 918-19. However, the school board failed to apply the criteria it had developed when it decided which school to close. *Id*. at 921. The plaintiffs sued the school board, alleging that its decision was arbitrary and capricious and should be declared null and void. *Id*. at 920. The trial court agreed with the plaintiffs and declared the school board's decision null and void. *Id*. at 921.

¶ 30    The appellate court reversed, noting that a school board has wide discretion in the exercise of its powers. *Id*. at 923. "The decision to close a school and to reassign the students to other attendance zones within the district is an exercise of the discretionary powers granted to the Board to act as a policy-making body, tantamount to the quasi-legislative power to make prospective regulations and orders." *Id*. at 927. The *Tyska* court stated that it was not for the courts to determine whether the means ultimately adopted by the board were wise or expedient or to interfere with the exercise of powers by the board in matters confided to its discretion. *Id*. at 930.

¶ 31    In *Clarke I*, defendant relied on *Tyska* in defending the 2011 Plan. *Clarke I*, 2012 IL App (2d) 110705, ¶ 26. In particular, defendant argued in *Clarke I* that the 2011 Plan was not a

SIP, meaning that it was not subject to the specific provisions and regulations of the School Code mandating compliance with the NCLB. *Id*. ¶ 31. Instead, defendant argued that the 2011 Plan was a proper exercise of its discretion under the general provisions of the School Code. *Id*. This court distinguished *Tyska* on the basis that *Tyska* did not consider the issue raised in *Clarke I*, which was whether provisions granting school boards certain general powers governed over the specific provisions mandating compliance with the NCLB. *Id*. ¶¶ 27, 29. Further, this court found that there was a genuine issue of material fact regarding whether the 2011 Plan was a SIP under the School Code, thus subjecting it to the provisions of the School Code and its regulations mandating compliance with the NCLB. *Id*. ¶ 25.

¶ 32    The dissent refers to the law-of-the-case doctrine in conjunction with *Clarke I*, along with the well-established principle that "where there exists a general statutory provision and a specific statutory provision *both relating to the same subject*–in either the same or another act–the specific provision controls and should be applied." (Emphasis added.) *Id*. ¶ 29. However, as we explain, there is no battle between the general and specific statutory provisions in this case. In *Clarke I*, this court did not answer the question of whether defendant had the general discretion to reconfigure the schools as part of the 2011 Plan, which is a separate question from whether the 2011 Plan violated the NCLB and the specific provisions in the School Code mandating compliance with the NCLB. Because these are separate questions, this court did not hold that on remand the trial court was required to find the 2011 Plan either wholly lawful or wholly unlawful.

¶ 33    Endeavoring to follow this court's decision in *Clarke I*, the trial court addressed whether the 2011 Plan was a SIP. Determining that the 2011 Plan "had many elements of a revised SIP," the court then found that the 2011 Plan failed to comport with the NCLB and the specific provisions of the School Code and its regulations implementing the NCLB. However, that finding did not render the entire plan null and void. On the contrary, the court distinguished between mandatory statutory requirements and discretionary functions. Unlike the part of the 2011 Plan that violated mandatory statutory requirements relating to the NCLB, the court properly determined, the part of the 2011 Plan reconfiguring Richmond and Davis was within defendant's "general power" or discretion under the School Code.

¶ 34    The facts leading up to defendant's decision to reconfigure the Davis and Richmond schools are undisputed. When Richmond failed to achieve AYP for the second consecutive year, the parents of Richmond students were given the "choice" to enroll their children in higher performing schools within the district. As a result, 117 students left Richmond and transferred to other schools in the district, including Davis. The court noted that "[b]ecause the students had departed Richmond under their legal right to do so, Richmond was underutilized." Although the court found that defendant developed the 2011 Plan, "at least in part, to resolve its AYP issue," the court also noted that defendant's superintendent, Don Scholmann, "testified that the problem leading up to the 2011 Plan was a facilities issue." Consequently, defendant reconfigured Richmond and Davis from two independent elementary schools into two interdependent elementary schools, with Davis serving students in kindergarten through second grade and Richmond serving students in third grade through fifth grade.

¶ 35    Although the dissent characterizes the "facilities issue" as a "pretext for [defendant's] unlawful action" (*infra* ¶ 53) and accuses defendant of intentionally contravening the NCLB,

the School Code, and its regulations, the trial court expressly found that defendant "admittedly adopted [the 2011] Plan for the general good." According to the court, the 2011 Plan was developed not only to resolve the AYP issue (which was its purpose only "*in part*" (emphasis added)), but also to address the underutilization of Richmond. Therefore, the court made the dual finding that defendant's decision to combine the two schools was within its general power but also that defendant's discretion could not eliminate its specific obligations under the NCLB and the School Code.

¶ 36 The court's finding was not contradictory, as the dissent urges. On the contrary, the court properly distinguished between the School Code's general, discretionary powers and the specific, mandatory requirements. On the one hand, defendant had the discretion to reconfigure the two schools in the 2011 Plan, as the school board in *Tyska* had the discretion to change the school attendance zones. As enumerated above, the School Code gives defendant the discretionary power to establish one or more school attendance units within the district (see 105 ILCS 5/10-21.3 (West 2010)). On the other hand, defendant was required to comply with the specific, mandatory provisions in the School Code implementing the NCLB, which it failed to do. Accordingly, the court determined that it was not defendant's reconfiguration that violated the mandates of the NCLB and the specific provisions and regulations of the School Code mandating compliance with the NCLB; rather, it was defendant's failure to address the subgroups at Richmond failing to achieve AYP that "ran contrary to the NCLB." The court correctly stated that its function in issuing a writ of *mandamus* was not to "replace the quasi-legislative authority of the [defendant] district but to require that the [defendant] district perform its mandated functions as opposed to" prohibiting it from "performing discretionary functions."

¶ 37 Because the decision to reconfigure the schools was discretionary, the court did not err by leaving that part of the 2011 Plan intact when issuing the remedy in its writ of *mandamus*. Therefore, plaintiffs' argument to the contrary fails.

¶ 38 B. Remedy

¶ 39 Both parties challenge the remedy ordered by the trial court in this case. The court ordered defendant to develop, within six months, a "Corrective Action Plan" in accordance with the mandates of the NCLB, the School Code, and its regulations. Plaintiffs argue, in addition to their argument regarding the reconfiguration, that the court erred by not ordering a major restructuring of the two schools, as required by the provisions in the School Code mandating compliance with the NCLB. See 105 ILCS 5/2-3.25d (West 2010) (requiring a restructuring plan when a school has not met AYP for six years). In its cross-appeal, defendant argues that the court exceeded its authority by ordering a Corrective Action Plan and that, because the authority to determine AYP status lies with the ISBE, the ISBE is a necessary party to this litigation. As we explain, it is not necessary to consider any of these arguments given our conclusion in this case.

¶ 40 The trial court's order mandated compliance with the NCLB, the School Code, and its regulations. In a footnote of the trial court's decision, it stated that "waivers of NCLB mandates" may be granted by the United States Department of Education upon the application of a state and that such an application had been made by Illinois. However, when the trial court ruled, the application had not been acted on and was still pending. On April 18, 2014, while this appeal was pending, the United States Department of Education approved

Illinois's request for a waiver from the mandates of the NCLB. The 2014 waiver, known as "ESEA (Elementary and Secondary Education Act of 1965, which was amended by the NCLB) flexibility," is effective for the 2014-15 school year. As stated, based on the 2014 waiver, defendant has now filed a motion to vacate the trial court's order and to dismiss the appeal and cross-appeal as moot.

¶ 41    Defendant argues that the case should be dismissed as moot because the 2014 waiver removes an actual controversy between the parties and renders it impossible for this court to grant plaintiffs relief. See *Jackson v. Board of Election Commissioners*, 2012 IL 111928, ¶ 28 ("A case on appeal becomes moot where the issues presented in the trial court no longer exist because events subsequent to the filing of the appeal render it impossible for the reviewing court to grant the complaining party effectual relief."); *Fisch v. Loews Cineplex Theatres, Inc.*, 365 Ill. App. 3d 537, 539 (2005) (an appeal is considered moot if no actual controversy exists or if events have occurred that make it impossible to grant the complaining party effectual relief). In particular, defendant argues that the case is moot because the 2014 waiver exempts Illinois "from complying with certain statutory provisions of the NCLB and the corresponding regulations, and thus, the conforming state statutes and regulations."

¶ 42    Plaintiffs have objected to defendant's motion to dismiss, arguing that the appeal is not moot. According to plaintiffs, the primary legal issue on appeal is, under the umbrella of *mandamus*, the proper legal remedy the trial court should have implemented for defendant's violations of law from 2011 to 2013. Plaintiffs argue that the 2014 waiver is not retroactive and that the adjudication of this case thus has nothing to do with the waiver.

¶ 43    We deny defendant's motion to dismiss the appeal as moot based on the 2014 waiver. Contrary to defendant's assertion, there is an actual controversy on appeal apart from the 2014 waiver, which is whether the trial court erred by ordering a remedy that did not return the two schools to the status quo *ante*. As discussed above, we have rejected plaintiffs' argument that the trial court erred by not undoing the reconfiguration as part of its remedy in the writ of *mandamus*. However, while the trial court endeavored to follow this court's opinion in *Clarke I* when it issued the writ of *mandamus*, its remedy necessarily preceded the 2014 waiver. Accordingly, the issue is what impact the 2014 waiver has on the remedy ordered.

¶ 44    We note that, when the trial court made its ruling, it was aware that a waiver application was pending but that the NCLB mandates were still in effect. It is unclear what remedy the trial court would have ordered had the 2014 waiver been in effect at the time of its ruling. Because we do not know the impact, if any, of the 2014 waiver on the remedy ordered by the court, we grant defendant's motion to vacate the court's writ of *mandamus* ordering defendant's compliance with the NCLB, the School Code, and its regulations and remand the case with directions to reconsider the remedy in light of the 2014 waiver.

¶ 45                                    III. CONCLUSION

¶ 46    The reconfiguration part of the 2011 Plan was within defendant's discretion, and the judgment of the Kane County circuit court to that effect is affirmed. Because the remedy ordered by the court preceded the 2014 waiver, we vacate the writ of *mandamus* and remand the case with directions that the court reconsider the remedy in light of the 2014 waiver.

¶ 47        Affirmed in part and vacated in part; cause remanded.

¶ 48        JUSTICE McLAREN, dissenting.

¶ 49        I respectfully dissent because there is no doubt that defendant, a governmental body, violated state and federal law and that plaintiffs established every element required to mandate the undoing of defendant's unlawful act. Sadly, plaintiffs will not receive the relief to which they are entitled. I agree with the trial court's finding:

>      "[O]nce Choice was implemented, the District cannot *eviscerate* past SIP failures by 'reconfiguring the school population.' This methodology only serves to circumvent the express requirements of the NCLB regulations. *** Under Section 5/2-3.25(d) [of the School Code], the District was obligated to adopt a Plan for Richmond School in 2011 for school years 2011-2013." (Emphasis added.)

Unfortunately, the trial court and the majority are now allowing such an evisceration. By failing to provide the proper remedy, the trial court contradicted its finding and defeated the purposes of the School Code and NCLB and the purpose of a writ of *mandamus*. The majority rubber-stamps the trial court's failure to hold defendant responsible to the people it is beholden to, by affirming the trial court's misguided judgment. Both the trial court and the majority operate under the fiction that there were two completely separate parts of the 2011 Plan; however, nothing in the record supports this "finding." In fact, the testimony presented by defendant regarding this issue was determined by the trial court to be "not credible." Thus, the reconfiguration of the schools and every other part of the 2011 Plan were inextricably intertwined and the parents and children are given short shrift by the trial court and the majority by their failure to nullify defendant's circumvention of the School Code and NCLB.

¶ 50        The main purpose of NCLB is to close the "achievement gap between high- and low-performing children, especially the achievement gaps between minority and nonminority students, and between disadvantaged children and their more advantaged peers." 20 U.S.C. § 6301(3) (Supp. I 2001). Defendant failed to bring Richmond's AYP up after two years of its ineffective SIPs. So, defendant moved "the problem" around by forcing half of the "limited English proficient" students to attend Davis and by forcing half of the high-performing Davis students to attend Richmond. By doing this, defendant subverted the purpose of NCLB: it denied the low-performing students choice; failed to provide them measurable, scientifically based strategies; and failed to involve parents, all in violation of NCLB, the School Code, and its regulations. The real rub of this is that defendant did all this while collecting Title I funds, which were to be used to supplement the educational needs of disadvantaged students. 20 U.S.C. § 6301 *et seq.* (Supp. I 2001). Any discretion defendant might have had was abused by its intentional subversion of both federal and state law, and its unlawful action must be undone.

¶ 51        The basis for denying plaintiffs effective relief is fallacious. Defendant's reconfiguration of the schools cannot be *isolated* from its failure to comply with the mandates of the School Code and NCLB. In its findings, the trial court "finds" that the reconfiguration was part and parcel of defendant's failed plan to comply with the mandates of the School Code and NCLB; and then, in its grant of relief, the trial court "determines" exactly the opposite. The record shows that defendant reconfigured the schools to avoid compliance with the specific statutory mandates that were required due to Richmond's AYP status problem.

¶ 52    The trial court recognized this pretextual deceit when it found that, even before the adoption of the 2011 Plan, "the District used the 2011 Plan to seek a 'roll back' [(reset)] in the AYP status at Richmond." Thus, defendant's explanation for the reconfiguration, that there was "a facilities issue," was a pretext for its unlawful action. Defendant's intention was clear: it reconfigured Richmond and Davis, as the trial court found, "to resolve its AYP issue." The trial court also found:

> "Although District personnel repeatedly denied that resolving the Richmond issue was a factor of the 2011 Plan, the Court does not find this testimony credible. The public presentations and the written material disseminated by the District unambiguously trace the root issue to the repeated failure at Richmond to meet Average yearly Progress (AYP).
>
> * * *
>
> The Court finds that what the district did in its 2011 plan in part was to combine two schools into one school with two campuses * * *. As our Appellate Court has indicated, a District may have that general power; its discretion cannot eliminate its obligations under the NCLB and the specific provisions of the school code that regulate its implementation. * * * Indeed [the two schools'] AYP status appears *inextricably intertwined* in the current configuration as the K-2 students are not tested for AYP and get their status by 'rollback' from the third grade students who attend in a different building." (Emphasis added.)

Thus, the trial court found that the *raison d'être* of the reconfiguration of the schools was to avoid the requirements of the School Code and NCLB due to AYP failure at Richmond. The trial court repeated this finding throughout its decision.

¶ 53    The majority states that I mischaracterize the " 'facilities issue' " as a " 'pretext for [defendant's] unlawful action.' " *Supra* ¶ 35. However, the majority supports its assertion by quoting the trial court out of context ("the trial court expressly found that defendant 'admittedly adopted [the 2011] Plan for the general good' "). *Id*. When read in context, the quoted portion has a different meaning than that espoused by the majority. The trial court found:

> "The [2011] Plan fails to address any specific subgroups, let alone those who were consistently failing AYP at Richmond. The NCLB is an acronym for 'No Child Left Behind', but the District *admittedly adopted a Plan for the general good* with no specific strategies for those subgroups who failed AYP. These subgroups have continued to fail after the 2011 Plan was implemented. Had the District not combined Davis and Richmond, Richmond would be subject to major restructuring under Section 1.85 for the 2012-2014 school year." (Emphasis added.)

The phrase "admittedly adopted a Plan for the general good" does not mean that the trial court found that it was for the general good. Rather, based on the trial court's finding that defendant's witnesses were not credible, it is more likely that the trial court meant only that defendant's witnesses merely testified that the 2011 Plan was adopted for "the general good." Therefore, this phrase, when read in context, further supports the conclusion that defendant's explanation for violating the School Code and NCLB was a pretext.

¶ 54    It is easy to understand why the trial court doubted the veracity of defendant's witnesses. If defendant believed that it was adopting the 2011 Plan for the general good, why did it

adopt the plan without input from those it served and from those with expertise in the field, namely, parents, teachers, and other professionals as required by the School Code and NCLB? Instead, defendant, in complete violation of the law, designed the 2011 Plan behind closed doors and announced it by "robocall" to those it was elected to serve. The trial court and the majority might believe that defendant's discretion cannot ever be abused when such autocratic actions are claimed to be benevolent. However, the record does not support this belief, because defendant cared more about an actuarial solution than the children left behind.

¶ 55    Alarmingly, when fashioning a remedy, the trial court contradicted its express "finding" with a "determination." Now, according to the trial court, it "determined" that defendant's reconfiguration of the schools was no longer "inextricably intertwined" with defendant's failure to comply with the School Code and NCLB; rather, according to the trial court, defendant had discretion to reconfigure the schools pursuant to *Tyska*, 117 Ill. App. 3d 917. However, this court had already rejected defendant's reliance on *Tyska* in *Clarke I*. *Clarke I*, 2012 IL App (2d) 110705, ¶ 27. In addition, this court had rejected defendant's argument that it had discretion to reconfigure the schools under certain statutory provisions. *Id*. ¶¶ 28-29. Thus, these bases for defendant's discretion to reconfigure the schools should be rejected as the law of the case. See *Village of Ringwood v. Foster*, 2013 IL App (2d) 111221, ¶ 33 (the law-of-the-case doctrine limits relitigation of a previously decided issue in the same case).

¶ 56    Curiously, the majority asserts that in *Clarke I* "this court did not answer the question of whether defendant had the *general* discretion to reconfigure the schools as part of the 2011 Plan." (Emphasis added.) *Supra* ¶ 32. However, defendant had "only those powers expressly conferred upon it by the General Assembly and those that [were] necessary to carry into effect the powers granted by the legislature." *Spinelli v. Immanuel Lutheran Evangelical Congregation, Inc.*, 118 Ill. 2d 389, 403 (1987). In *Clarke I*, we rejected defendant's statutory bases for reconfiguring the schools, stating that the specific provisions of the School Code addressing NCLB control over the general-powers provisions of the School Code cited by defendant. *Clarke I*, 2012 IL App (2d) 110705, ¶ 29.

¶ 57    I agree with the majority that in *Clarke I* we did not require the trial court to make any specific finding. However, the majority fails to recognize that in *Clarke I* we directed the trial court that if the allegations in the complaint were proved, *i.e.*, if the 2011 Plan was a SIP, plaintiffs would be entitled to the relief they sought. See *id.* ¶¶ 31, 39.

¶ 58    On remand the trial court found:

> "There is no question that the 2011 plan adopted by the District had many elements of a revised SIP or Corrective Action Plan. Indeed the District's Superintendent testified that the 2011 plan was a SIP except that the District didn't 'fill out the paperwork.' "

Therefore, the narrow question of fact, whether the 2011 plan was a SIP, was essentially answered in the affirmative. Thus, pursuant to *Clarke I*, plaintiffs were entitled to the relief they sought.

¶ 59    Regardless of the law of the case, any discretion defendant might have had to reconfigure the schools under its " 'general power' or discretion under the School Code" (*supra* ¶ 33) was palpably abused when defendant used its power to reconfigure the schools to subvert the clear mandates of the School Code, its regulations, and NCLB. See *Kermeen v. City of Peoria*, 65 Ill. App. 3d 969, 972 (1978). Defendant's "discretion" was used to achieve an illegitimate purpose via the actuarial ploy of melding the two schools. Through this single

deceit, defendant sought the AYP rollback, the evisceration of past SIP failures, and the circumvention of the express requirements of the NCLB regulations.

¶ 60    Defendant intentionally contravened NCLB's overarching goal of "ensur[ing] that all children have a fair, equal, and significant opportunity to obtain a high-quality education and reach, at a minimum, proficiency on challenging State academic achievement standards and state academic assessments." 20 U.S.C. § 6301 (Supp. I 2001). The trial court properly found that "[t]he 2011 Plan contained no measures whereby the failing subgroups were addressed." Defendant's lack of concern for its low-performing, limited-English-proficient students, and the lack of any effective remedy, invites other school districts to evade their obligations to disadvantaged and low-achieving students. Defendant's reconfiguration of the schools accomplished nothing more than moving the problem of one school's failing children to another school and moving the other school's children, with no apparent benefit to them, from their local school to a different, distant school, for the sole purpose of utilizing their collective test scores.

¶ 61    Further, defendant's discretion is expressly limited by section 10-20 of the School Code. 105 ILCS 5/10-20 (West 2010) ("This grant of powers does not release a school board from any duty imposed upon it by this Act or any other law."). Therefore, defendant's discretionary powers were limited by the specific provisions of the School Code that it chose to violate. See *Clarke I*, 2012 IL App (2d) 110705, ¶ 28.

¶ 62    Accordingly, the remedy here should include the undoing of the reconfiguration of Richmond and Davis schools, and anything less than that is no remedy at all. See *Noyola*, 179 Ill. 2d at 133 (the writ of *mandamus* can be used to compel the undoing of an act). If the writ of *mandamus* has any purpose, it is here. The entire action taken by defendant should be abrogated and the status quo *ante* returned. Thereafter, the parties can decide whether further action is to be taken and whether further relief is necessary pursuant to the present status of the law.

¶ 63    With regard to defendant's motion to dismiss, its motion is a red herring. The fact that there might or might not be a waiver of *future* NCLB requirements has nothing to do with the vacation, abrogation, or repeal of defendant's obligations pursuant to state statute absent retroactive repeal of such statute by the state legislature. Until the status quo *ante* has been effectuated, there remains substantial relief that can and should be effectively realized. Until the status quo *ante* has been effectuated, the purpose of the writ of *mandamus* remains unfulfilled.

¶ 64    I submit that the trial court was correct when it stated, "the better approach [was] to place the process on the track where it went off the track." Unfortunately, the process went off the track when defendant was guilty of, in the trial court's words, "eviscerating past SIP failures by 'reconfiguring the school population.' " Thus, at a minimum, the "better approach" is to undo the reconfiguration of the schools. To conclude otherwise is to permit pernicious abuses of discretion that subvert or avoid statutory mandates. See *Kermeen*, 65 Ill. App. 3d at 972 ("If a discretionary power is exercised with manifest injustice or if a palpable abuse of discretion is clearly shown, mandamus will issue.").